Filed 9/23/15  In re Baby Girl S. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re Baby Girl S., a Minor. | H041998<br>(Santa Clara County<br> Super. Ct. No. AD023423) |
| D.P. et al.,<br><br>        Petitioners and Respondents,<br><br>        v.<br><br>S.W.,<br><br>        Objector and Appellant. | |

D.S. (mother), the biological mother of Baby Girl S. (baby), placed baby with prospective adoptive parents, D.P. and K.N. (petitioners), who filed a petition to terminate the parental rights of S.W. (father), baby's biological father.  (See Fam. Code, § 7662.)[1]  Father appeals from the trial court's order finding that he was not a "presumed

---

[1] All further statutory references are to the Family Code unless otherwise stated.  Section 7662 provides:  "If a mother relinquishes for or consents to, or proposes to relinquish for or consent to, the adoption of a child, or if a child otherwise becomes the subject of an adoption proceeding, the agency or person to whom the child has been or is to be relinquished, or the mother or the person having physical or legal custody of the child, or the prospective adoptive parent, shall file a petition to terminate the parental rights of the alleged father, unless one of [specified circumstances] occurs . . . ."

father" entitled to withhold consent to adoption and terminating his parental rights. (See § 7669, subd. (a).)[2]

On appeal, father asserts that he qualified as a nonstatutory presumed father under the authority of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) "due to his demonstrated commitment to his parental responsibilities" and "because he did all he could do *under the circumstances*, both before and after [baby's] birth, to assume his parental responsibilities." He maintains that substantial evidence does not support the trial court's finding he was not a presumed father under *Kelsey S.* and, consequently, the trial court erred in terminating his parental rights.

We conclude that father failed to demonstrate a prompt and full commitment to his parental responsibilities as required by *Kelsey S.* and affirm.

I

*Factual and Procedural History*

A. *Procedural Background*

On April 11, 2014, petitioners filed a petition to terminate father's parental rights as to baby. The petition indicated that, within a week, they would be filing a request to adopt baby, born in March 2014, in the Santa Clara County Superior Court. It alleged that child did not have a presumed father described by section 7611 and mother consented to petitioners' adoption of baby and she "intends to sign an Independent Adoption Placement Agreement on April 11, 2014." It further alleged that it was "in the best interest of the minor that this adoption be allowed to proceed without the necessity of the consent of [father]."

---

[2] "An order requiring or dispensing with an alleged father's consent for the adoption of a child may be appealed from in the same manner as an order of the juvenile court declaring a person to be a ward of the juvenile court and is conclusive and binding upon the alleged father." (§ 7669, subd. (a).)

2

On May 16, 2014, father filed, in propria persona, an ex parte petition seeking appointment of counsel, custody of baby, and visitation with baby. The court ordered appointment of counsel for father.

On May 23, father filed a "Request for Order" asking for an order granting him legal and physical custody of baby pending the hearing on his request, DNA testing, and, if shown to be the biological father, an adjudication of paternity, modification of baby's birth certificate to give the baby his last name and reflect that he is her father, and the disclosure of contact information for the adoption agency or persons connected with adoption of baby. A hearing was set for July 10, 2014.

At a hearing on July 3, 2014, the hearing on father's request for an order was reset for July 24, 2014. The July 3, 2014 minute order indicates the parties stipulated to meet at a park on July 12, 2014 for visitation between father and baby.

On July 24, 2014, the court ordered visitation to take place between father and baby once a week for up to two hours on the weekend and to be supervised by a professional agency selected from the approved family court list of services. The court required father and his counsel to notify petitioners of the professional agency they selected no later than July 28, 2014 and petitioners to contact the selected agency no later than July 30, 2014 to coordinate visitation. The court also appointed counsel for baby.

By written document filed on August 19, 2014, mother joined in the petition to terminate father's parental rights. Mother was appointed counsel.

B. *Hearing on Petition to Terminate Parental Rights*

The hearing on the petition to terminate parental rights commenced on December 8, 2014 and, after three days of testimony, concluded on December 11, 2014. Father failed to appear on December 8, 2014 and December 11, 2014 but his appointed counsel was present. The parties stipulated that father was baby's biological father. They stipulated that the court could take judicial notice of all orders and pleadings in the Santa Clara County Superior Court's case file. They further stipulated that the court

3

could consider father's criminal history and his "paternity filings" in Shasta County Superior Court and Contra Costa County Superior Court.

At the hearing, D.P. testified that her husband and she met mother and baby on March 27, 2014 in mother's apartment. They were told that there were two possible birth fathers, B.S. or father. D.P. and her husband jointly decided to adopt baby on March 28, 2014. They took baby into their care on March 29, 2014 at 9:00 a.m.

D.P. stated that, between March and May of 2014, D.P. and her husband had no personal contact with father. Through their counsel, they learned that father was concerned about the adoption and wanted a DNA test.

On May 4, 2014, after D.P. obtained an email address from baby's mother and before any paternity test results, D.P. sent an email to father. D.P. and father spoke on the telephone. Father said that if he proved to be the natural father of baby through a DNA test, he would be interested in parenting and would contest the adoption. D.P. and father exchanged email messages. On May 6, 2014, D.P. received an email from father stating in part, "I just dont [*sic*] know if I could sit back and let my first born child be taken from me without a fight." Sometime in May 2014, just after DNA test results came back, father began asking for visitation with baby. On May 24, 2014, D.P. received father's email request for pictures of baby.

D.P. testified that father visited with baby four times and each visit was approximately an hour. The first visit took place on July 12, 2014 at Vasona Park in Los Gatos. Father brought a very small blanket and a knit hat as gifts for baby. Petitioners did not allow father to hold or feed baby. They chatted and took photos. At trial, D.P. complained that father smelled strongly of cigarette smoke.

D.P. stated that the next visit, which was supervised, took place in a church's nursery in Mountain View. D.P. gave the baby to the visitation supervisor and sat outside the door. The supervisor called petitioners back in because baby was crying and inconsolable. Third and fourth visits between father and baby also took place at the

4

church and were supervised. During the third visit, father had a difficult time with baby. During the fourth visit in August of 2014, father asked petitioners to stay. Father held the baby and played with her. Petitioners voluntarily withdrew to another part of the room so father and baby could be alone. Father was unable to feed her with a bottle because his hand was shaking so badly. Father asked D.P. for help.

D.P. reported that the last time she was asked "for any kind of contact" with father was in August 2014; father had no contact with petitioners following his last visit with baby in August 2014. Father had missed a fifth scheduled visit with baby. The visitation supervisor decided to not schedule any further visits until she heard directly from father.

D.P. testified that father never offered or sent any money for support of baby.

Nathan Thomas, the supervising social worker at Legal Advocates for Children & Youth (LACY), testified that he was asked to perform an assessment of the attachment between the prospective adoptive parents and baby. In Thomas's opinion, baby had developed a primary and secure attachment to petitioners and it would be detrimental to remove her from them at this stage.

Steve Goetze, a licensed clinical social worker who works for LACY doing assessments for child visitation and custody, testified as an expert on the assessment of risk, including the risk of drug abuse, and the evaluation of children's best interests with respect to custody and visitation. In his opinion, termination of father's parental rights and adoption by petitioners was in baby's best interest.

Goetze also interviewed mother. Mother had four children older than baby. She indicated that she had lived with B., the father of her fourth child who was two years of age at the time of the interview.

Mother told Goetze that father assaulted her on two occasions. One time, father allegedly hit her head while she was driving and her ear hit the door and split open. Another time, father allegedly threw mother down on the sidewalk. Goetze recalled that

5

mother indicated she was pregnant on at least one of those occasions. She had not made a police report about those incidents.

Mother acknowledged to Goetze that she had smoked heroin with father one time. She reported using cocaine and alcohol.

Goetze also interviewed the petitioners and visited their home. They presented no risk factors.

In Goetze's interview with father, father acknowledged that mother and he had wrestled at times and things had become physical. Father indicated mother had been violent toward him.

Goetze had concerns about father's mental health because father's mother had a substance abuse issue and she had died when father was eight years old. Father had witnessed his mother dying. His father was already out of the picture at the time his mother died. Father told Goetze that he had been diagnosed with post traumatic stress disorder (PTSD) since he was eight years old and PTSD was the reason for his shaking.

Father indicated to Goetze that he began using heroin when he was about 22 years old. He smoked or ingested it but he did not inject it. Goetze learned that father was in a residential drug treatment program from October 2013 through December 2013. After father's last visit with baby, he relapsed on heroin even though he had been "clean" for about nine months. According to Goetze, father was not currently availing himself of any treatment program.

During the interview with Goetze, father indicated that he had a residential burglary conviction. When confronted by Goetze with a newspaper article about a carjacking, father indicated that some of those charges had been reduced to misdemeanors. Goetze was concerned about father's ability to parent because he had some significant criminal activities involving violence, there were domestic violence allegations against him, he had substance abuse issues, and his contact with baby had been limited.

6

In assessing risk to a child, Goetze considers, among other factors, the stability of a parent's housing and employment. Father indicated to Goetze that he was currently living with a sister. Father had a limited work history. He had briefly worked at McDonald's, he had been in the army, and he had worked at a recycling plant. According to father, he was supposed to begin a job at Mama's, which Goetze believed was a restaurant, in September 2014.

In Goetze's opinion, four visits, each one to two hours, were insufficient to establish an attachment between a parent and a child, even assuming the visits went as well as possible. Goetze did not understand why father broke off contact with petitioners if he hoped to establish a relationship with baby. It was his opinion that father's parental rights should be terminated.

Petitioners' counsel called father to testify at the hearing. He stated that he was 26 years old and lived with his sister, who paid the rent. He was currently not working. He occasionally assisted with the rent when he came "across the money." He did not have a driver's license. He was on probation and he was under an order to stay away from Safeway premises.

Father began seeing mother at the end of April 2013. They were together every day until they stopped seeing each other in late August or September, 2013. Father had been using heroin on and off since he was 22 years old. He had provided mother with drugs.

Between April and September 2013, father attempted to go into "detox" a number of times but he always began using heroin again. Father went into a rehabilitation program in October of 2013 and he completed it. Since graduating from that program, he had nevertheless used heroin about three to five times. Father had used heroin most recently about two and a half months before the hearing. He was not currently enrolled in an inpatient or outpatient drug treatment program. He was not currently attending AA or NA meetings.

7

Father believed his own mother was on crack when he was born. After she died when he was eight years old, father was "bounced from house to house." He was adopted when he was 10 years old. As a child, he used weed and alcohol.

Father had not contacted petitioners to arrange any further contact with baby after his last supervised visit with baby in August of 2014.

Petitioner K.N. testified regarding himself, his family, family life, and baby. He talked briefly about baby's visitation with father and his and his wife's contact and experience with father.

Virginia Jones was called to testify on behalf of father. Jones, an associate social worker with a master's degree in social work, observed a visit between father and baby at a park in Los Gatos in July of 2014. Jones did not recall that father smelled of cigarette smoke. He was well groomed and appropriately dressed. He was respectful and deferential. He arrived on time, before petitioners and baby. He brought a blanket and, she believed, an outfit for baby. Father smiled at the baby and attempted to interact with her. Baby did not cry or look uncomfortable. Father asked appropriate questions about baby. Father was not allowed to hold baby but he was allowed to take pictures. Father was very excited to see baby and he did not behave aggressively in any way. He was not under the influence.

Father testified on his own behalf. He did not know whether, where, or when mother received prenatal care during her pregnancy with baby. Father claimed that he would have gone to prenatal care appointments if he had known of them or if mother had allowed him to go. Mother had not told father when or where the baby would be born. Father claimed he would have been present at baby's birth if he had known about it or if mother had allowed him to go.

Father indicated mother and he had stayed at her parents' house in Shasta County and her parents had provided food and shelter. Although they did not then have "solid proof," mother and father had been trying for a baby and they thought mother was

8

pregnant.  Father acknowledged that he was participating in drug use with mother at that time but he said that it was "her choice" and he "couldn't stop her."  They were kicked out of her parents' house because they were still using drugs.

During August and September of 2013, mother and he saw each other off and on and they still were using drugs.  Father was in and out of "detox" during September of 2013.  They were "bouncing . . . back and forth from her mother's house."  Mother was sometimes staying in a motel or hotel.  In September of 2013, father visited mother when he was high and she kicked him out.

Father initially claimed he had offered to pay money for mother's expenses during her pregnancy.  He said that he saw mother spend money that he gave her on drugs and alcohol.  When asked if he ever tried to send money for mother's prenatal care or baby's birth to mother at her parents' address, he testified he tried to go through mother's mother who said they did not want his money. But father did not actually send any money to her parents' address.  Father later made clear that he did not have any money before the baby's birth and indicated that any financial help would have come from his family.

Mother's mother wired some money to father to get to a program.  From October 2013 through December of 2013, father was in a residential treatment program.  He remained in the program until March 21, 2014 in order to mentor others.  He was receiving government assistance.

According to father, mother indicated that she did not want emotional support from him during her pregnancy with baby by accusing him of abusing her and saying he was harassing her when he inquired about baby.  At the hearing, father denied punching mother in the ear while she was driving and throwing her to the ground while she was pregnant.  He explained that they "wrestled" when mother "used to get crazy and try to punch [him] and scratch [him]" and he "would try to hold her down . . . ."

In an email to father dated November 4, 2013, mother threatened to get a restraining order and said in part, "I have had a lot of time to think about things and

considering the abuse I underwent verbally, mentally and physically, [I hope you haven't forgotten that you punched me in the side of the head and split my ear open when I was driving, and you threw me to the ground so hard my head bounced off the pavement. . . . WHILE I WAS PREGNANT] . . . I do mean it when I say that I don't want anything to do with you." She also told father that the baby would be adopted. In an email to mother dated November 6, 2013, father stated in part, "I admit that I am wrong for everthing [*sic*] I did when I was high and the things I did when I wasn't and Im [*sic*] sorry. [I'll] leave u alone [D.] and finish my program so I can atleast [*sic*] have a chance to fight for my first born . . . ."

Father testified that, prior to baby's birth, mother made it clear to him that she did not want contact with him, she did not want his help, and she did not want to give him information regarding her healthcare, the baby, or birth plans.

According to father, "since day one," he had informed mother that he did not want baby adopted. He said he sent her emails about sharing custody of baby. On January 13, 2014, father filed a petition to establish paternity in Shasta County Superior Court. The home address of mother's parents in Shasta County was the last address that father had for mother. On January 24, 2014, less than two months before baby was born, father filed a "Request for Order" seeking custody of and visitation with baby in Shasta County Superior Court. Father was allowed to file those documents without paying fees.

Father testified that mother's email address was the only contact information he had for her. According to father, mother refused several times to give her residential address to him. Father did not have a telephone number for mother although they would talk when she called from blocked numbers.

Father testified that, after baby's birth, mother indicated to him that she did not welcome support from him by telling him not to contact her and to keep his family from contacting her and by threatening to get a restraining order. In an email to father dated

10

March 21, 2014, mother said baby was white and indicated B. might be the father, not him.

On April 8, 2014, after mother informed father that she had moved to Contra Costa County, father filed a "Petition to Establish Parental Relationship," a "Request for Order," and related documents in the Superior Court of Contra Costa County. He still had only an email address for mother and he had no telephone number. According to father, he asked mother for her address and telephone number several times and also asked to see baby several times.

Mother told father that baby was being adopted. Father hired attorney Oliver Greenwood to help him get visitation with and custody of baby and to stop baby's adoption. Father testified that he never told anyone that he would consent to adoption of baby. To the contrary, he told friends and attorney Greenwood that he would not consent to baby's adoption. According to father, mother received emails from Greenwood concerning service of documents, paternity testing, visitation, and pictures of baby.

Father testified that mother sent pictures of baby to him. Father asked to visit baby. He showed the pictures of baby to family or friends. Father posted photographs of baby that he had received from mother during April 2014 on his Facebook page. Underneath one photograph of baby, father wrote, "She sent me this pic and said that this is mu [*sic*] baby . . . hell naw," and, underneath another photograph of baby, he wrote, "She must think I'm stupid."

In an email to mother dated April 22, 2014, father asked, "Do [you] need any help with anything as far as money?" Mother responded in part, "What? [S.] if you wanted to help financially . . . While I was pregnant with your child would have been a good time to ask." At that time, baby was in the care of petitioners, who had already filed a petition to terminate his parental rights.

11

After receiving email from petitioners, father asked them to allow him to visit baby. He did not see baby until July 12, 2014, after he had gone to court to obtain visitation. Father testified about the visits with baby.

At the hearing, father indicated that he had housing for himself and baby with his family. He currently did not have a job but he was seeking employment. He was currently on probation, which would end in December 2015. His sisters and brothers, who resided locally, would provide childcare when he obtained employment.

Father admitted that his family had not given any gifts, supplies, or money for baby to mother since baby's birth in March 2014. His family had never provided him with funds to provide material support to baby. Father had not given money for baby's support or any baby supplies to petitioners since baby's birth aside from his gifts of a blanket and a toy. Since the last visit in August of 2014, father had not contacted petitioners, either directly or indirectly through counsel, to schedule further visits with baby and had not notified them that he could not visit because he lacked the funds to pay for supervised visits. Since August of 2014, father had not contacted petitioners to ask how baby was doing developmentally or to obtain more photographs of her.

A.B., father's older brother, testified that he drove father to Shasta County and to Contra Costa County to file documents. A.B. indicated that, prior to baby's birth, other family members and he tried to make offers of financial help to mother but she told them that they were harassing her and she did not want anything to do with father.

Greenwood, an attorney, testified that he provided legal services to father in a paternity action filed in Contra Costa County. Greenwood had communicated with mother by email. He had attempted to work out a way to serve her with the legal paperwork at a neutral location. He asked mother not to relinquish parental rights before genetic testing. Greenwood had attempted to get a photograph of baby from petitioners' attorney. Greenwood asked petitioners' attorney for visitation between father and baby.

12

A number of emails reflected Greenwood's efforts to arrange DNA testing. In emails to Greenwood, mother claimed father was abusive and expressed fear of father.

In an email dated April 9, 2014, petitioners' attorney told Greenwood in part: "[Mother] just called and told me that she really doesn't much want to hear from you again. . . . According to [her], you client is physically abusive and a heroin addict. She would like him to remain out of her life." In an email dated April 9, 2014, mother told attorney Greenwood that her contact information was private and stated, "Your client has been physically/verbally abusive to me in the past (while I was pregnant), and it is important he doesn't know mine and my children's whereabouts." In an email dated April 10, 2014, petitioners' attorney told Greenwood that he might be able to get mother's address but "fyi, she is afraid of your client . . . and I'm not in a position to alienate her." In an email dated April 10, 2014, mother told Greenwood, "Your client is a drug addict who is physically abusive and has a criminal record. [¶] He will NOT parent my child. I am signing the waiver tomorrow and my child will never have to experience the abuse I underwent."

The trial court disbelieved father's denials of domestic violence and found father assaulted mother while she was pregnant. The court found that father was together with mother for two or three months while she was pregnant but he offered no evidence demonstrating that he provided financial support to her or he was taking his "anticipated parental responsibilities seriously" during that period. It noted that father did not provide any evidence that he attended prenatal appointments or otherwise supported mother with any aspect of her pregnancy before their relationship ended. The court observed that father did *not* show that, during July through September 2013, "he publically proclaimed the baby in [mother's] womb to be his or . . . he intended to raise that child."

The trial court found that father was admittedly high on drugs when he tried to visit mother in September of 2013. The court also found that father was physically unavailable to help mother from October 2013 to March 2014 because he was in a

13

residential rehabilitation program. The court found that father made no effort to provide money to mother through her parents, whose whereabouts father knew since mother and he had stayed with them in Shasta County.

The trial court found, however, that from January 2013 until July 2014, father made a "substantial effort to establish his legal rights and integrate himself into [baby's] life." But it also found that, after August 2014, father had "fallen woefully below the mark" and failed to pursue visitation with baby or provided any type of support. In addition, father had relapsed and used heroin again and he not taken any steps toward sobriety. He had not secured employment or a driver's license. Father had missed two out of three days of the hearing on the petition to terminate his parental rights.

The trial court determined that father was not a statutory or nonstatutory presumed father and his consent was not needed for adoption. It also concluded that it was in baby's best interest to terminate father's parental rights.

II

*Discussion*

A. *Legal Background*

Section 7611 states the basis for statutory "presumed father" status. Father, who had neither legally married nor attempted to legally marry mother, could not become baby's "presumed father" under the statutory definition unless he physically received baby into his home and openly held baby out as his natural child.[3] (See § 7611, subd. (d);

---

[3] Section 7611 provides in pertinent part: "A person is presumed to be the natural parent of a child if the person meets the conditions provided in Chapter 1 (commencing with Section 7540) or Chapter 3 (commencing with Section 7570) of Part 2 or in any of the following subdivisions: [¶] (a) The presumed parent and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court. [¶] (b) Before the child's birth, the presumed parent and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with (continued)

14

*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051 (*Michael H.*).) "Under California law, a biological father who shoulders the responsibilities of fatherhood by marrying the child's mother, or by actually living with, caring for, and acknowledging the child as his own, is a 'presumed' father with the same right as the biological mother to withhold consent to the child's adoption. [Citation.]" (*Michael H. supra*, at p. 1063, fn. omitted.)

Ordinarily, "when a biological father does not qualify as a 'presumed' father, a court can terminate his parental rights and free the child for adoption, upon a finding that the proposed adoption will be in the 'best interest of the child.' (§ 7664, subd. (b).)" (*Michael H.*, *supra*, 10 Cal.4th at p. 1063.) Section 7660 provides: "If a mother relinquishes for or consents to, or proposes to relinquish for or consent to, the adoption of a child who has a presumed parent under Section 7611, *the presumed parent shall* be given notice of the adoption proceeding and *have the rights provided under Part 2 (commencing with Section 8600) of Division 13*, unless that parent's relationship to the child has been previously terminated or determined by a court not to exist or the presumed parent has voluntarily relinquished for or consented to the adoption of the child." (Italics added.) Section 8604, subdivision (a), provides in part: "Except as

law, although the attempted marriage is or could be declared invalid, and either of the following is true: [¶] (1) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce. [¶] (2) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation. [¶] (c) After the child's birth, the presumed parent and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true: [¶] (1) With his or her consent, the presumed parent is named as the child's parent on the child's birth certificate. [¶] (2) The presumed parent is obligated to support the child under a written voluntary promise or by court order. [¶] (d) The presumed parent receives the child into his or her home and openly holds out the child as his or her natural child." Section 7540 et seq. concerns the presumption that a child of a wife cohabiting with her husband is a child of the marriage. Section 7570 et seq. concerns voluntary declarations of paternity.

15

provided in subdivision (b), *a child having a presumed father under Section 7611 shall not be adopted without the consent of the child's birth parents, if living.*[4]  (Italics added.)

In *Kelsey S.*, father had "openly held out the child as being his own" but he had been prevented from physically receiving the child into his home by the mother and court order and also allegedly by the prospective adoptive parents.  (*Kelsey S.*, *supra*, 1 Cal.4th at p. 825.)  "[The California Supreme Court] observed in *Kelsey S.* that a biological father who wanted to marry the child's mother or to take the child into his home, care for it, and hold it out as his own, but who was prevented from doing either by the mother's unilateral decisions not to marry him and to place the child in an adoptive home would, under the statutory scheme, be deprived of the right to withhold consent to adoption and to keep the child himself.  This, [the court] said, would violate the federal constitutional guarantees of equal protection and due process.  (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)" (*Michael H.*, *supra*, 10 Cal.4th at p. 1063.)

"*Kelsey S.* did not, however, strike down the statutory scheme for 'presumed' fathers; instead, it established a nonstatutory alternative whereby a biological father could qualify for the same parental rights as those afforded by statute to presumptive fathers." (*Michael H.*, *supra*, 10 Cal.4th at p. 1063.)  In *Kelsey S.*, the Supreme Court determined that the former statutory scheme regarding presumed fathers, which is continued in the present Family Code, "violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a

---

**4** "The consent of a presumed father is not required for the child's adoption unless he became a presumed father as described in Chapter 1 (commencing with Section 7540) or Chapter 3 (commencing with Section 7570) of Part 2 of Division 12, or subdivision (a), (b), or (c) of Section 7611 before the mother's relinquishment or consent becomes irrevocable or before the mother's parental rights have been terminated."  (§ 8604, subd. (a).)

16

showing of the child's best interest." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Ibid.*, fn. omitted.)

In deciding whether a father is a nonstatutory presumed father under *Kelsey S.*, "[a] court should consider all factors relevant to that determination." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) "The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgment of paternity, payment of pregnancy expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*, fn. omitted.) But the foregoing "language does not mean that an unwed father must continually express an unequivocal desire to raise his child from the very moment he learns of the pregnancy or that he can never take a minute to reflect on the importance of his decision and the responsibilities that will come with it." (*Michael H.*, *supra*, 10 Cal.4th at p. 1054.)

In *Kelsey S.*, the Supreme Court emphasized the narrowness of its decision. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) It made clear that "[t]he statutory distinction between natural fathers and presumed fathers is constitutionally invalid *only to the extent* it is applied to an unwed father who has *sufficiently and timely* demonstrated a full commitment to his parental responsibilities." (*Ibid.*, second italics added.) It declared

17

that "[o]ur statutes ([former Civ. Code,] §§ 7004 & 7017, subd. (d)(2)) are constitutionally sufficient when applied to a father who has failed to make such a showing."[5]  (*Id.* at pp. 849-850.)

The constitutional interest recognized in *Kelsey S.* is, however, "merely inchoate (*Lehr v. Robertson* (1983) 463 U.S. 248, 261-263).  (*Michael H.*, *supra*, 10 Cal.4th at p. 1052.)  That constitutional interest "does not ripen into a constitutional right that [an unwed father] can assert to prevent adoption unless he proves that he has 'promptly come[ ] forward and demonstrate[d] a full commitment to his parental responsibilities . . . .'  (*Kelsey S.*, *supra*, 1 Cal.4th 816, 849.)"  (*Ibid.*)  "This is so because 'the mere existence of a biological link does not merit . . . constitutional protection' (*Lehr v. Robertson*, *supra*, 463 U.S. at p. 261); rather, the federal Constitution protects only the parental *relationship* that the unwed father has actively developed by ' "com [ing] forward to participate in the rearing of his child" ' (*ibid.*) and 'act[ing] as a father' (*Caban v. Mohammed* (1979) 441 U.S. 380, 389, fn. 7)."  (*Ibid.*)

In *Michael H.*, *supra*, 10 Cal.4th 1043, the trial court determined that the father's extraordinary efforts in the two years *following* his son's birth sufficiently demonstrated his full commitment to his parental responsibilities within the meaning of *Kelsey S.*  (*Id.* at p. 1053.)  The Supreme Court clarified that a father must promptly demonstrate "a 'full commitment' to parenthood *during* pregnancy and within a short time after he discovered or reasonably should have discovered that the biological mother was pregnant with his child" and "he cannot compensate for his failure to do so by attempting to assume his parental responsibilities many months *after* learning of the pregnancy."  (*Id.* at p. 1054.)

---

[5] Former Civil Code Section 7004, subdivision (a), is continued in section 7611. (See Cal. Law Revision Com. com, 29G Pt.1 West's Ann. Fam. Code (2013 ed.) foll. § 7611, p. 270.)  Former Civil Code Section 7017, subdivision (d), is continued in section 7664.  (See Cal. Law Revision Com. com, 29G Pt.1 West's Ann. Fam. Code (2013 ed.) foll. § 7664, p. 417.)

Where a biological father is neither a statutory presumed father nor a *Kelsey S.* father, his consent is not required for adoption. Under that circumstance, a child's best interest will determine whether an adoption may proceed without the biological father's consent and his parental rights terminated under section 7664. (§ 7664[6]; see *Kelsey S.*, *supra*, 1 Cal.4th at p. 831.)

B. *Standard of Review*

"The burden is on a biological father who asserts *Kelsey S.* rights to establish the factual predicate for those rights. [Citation.]" (*In re Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679; see Evid. Code, § 500.) The standard for reviewing a trial court decision regarding whether an unwed biological father has obtain *Kelsey S.* father status is unsettled. Some appellate courts state they are applying the substantial evidence test while other courts state they are applying the substantial evidence test as to the facts but they are exercising their independent judgment as to whether the facts satisfy *Kelsey S.*[7]

---

[6] Section 7664 provides: "(a) If, after the inquiry, the biological father is identified to the satisfaction of the court . . . , notice of the proceeding shall be given in accordance with Section 7666. If any alleged biological father fails to appear or, if appearing, fails to claim parental rights, his parental rights with reference to the child shall be terminated. [¶] (b) If the biological father or a man representing himself to be the biological father claims parental rights, the court shall determine if he is the biological father. The court shall then determine if it is in the best interest of the child that the biological father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the biological father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child. [¶] (c) If the court finds that it is in the best interest of the child that the biological father should be allowed to retain his parental rights, the court shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights . . . is the biological father [but] it is in the child's best interest that an adoption be allowed to proceed, the court shall order that the consent of that man is not required for an adoption. This finding terminates all parental rights and responsibilities with respect to the child."

[7] The questions whether a mother thwarted a biological father's efforts to receive a child into his home and openly hold baby out as his natural child and whether the father did as much as he possibly could to promptly and fully show his commitment to (continued)

(See e.g., *Adoption of Emilio G*. (2015) 235 Cal.App.4th 1133, 1144-1145 [applying substantial evidence standard of review to trial court's findings of facts and exercising independent judgment in measuring the facts against the applicable legal standard]; *Adoption of Baby Boy W*. (2014) 232 Cal.App.4th 438, 452-453 & fn. 14 [applying substantial evidence test but indicating that it would reach the same result under an independent standard of review]; *In re D.S*. (2014) 230 Cal.App.4th 1238, 1244-1245 [applying the substantial evidence test to factual findings and indicating that whether father's inchoate constitutional interest had ripened into a constitutional right under *Kelsey S*. was a "predominantly legal inquiry"]; *In re D.A*. (2012) 204 Cal.App.4th 811, 826 [applying substantial evidence standard of review]; *In re M.C*. (2011) 195 Cal.App.4th 197, 222 [applying substantial evidence standard of review]; *Adoption of O.M*., *supra*, 169 Cal.App.4th at pp. 679-680 [applying substantial evidence test to trial court's factual findings and exercising independent judgment in measuring the facts against the applicable legal standard]; *In re J.L*. (2008) 159 Cal.App.4th 1010, 1023 & fn. 5 [applying substantial evidence standard of review but indicating that it would reach the same result under a de novo standard of review]; *In re Adoption of Arthur M*. (2007) 149 Cal.App.4th 704, 717-718 [result was "the same under either a deferential or independent review"].)

C. *Analysis*

It is undisputed that father did not qualify as a statutory presumed father under section 7611. The issue is whether he satisfied the *Kelsey S*. standard by "*sufficiently and timely* demonstrat[ing] a full commitment to his parental responsibilities." (*Kelsey S*., *supra*, 1 Cal.4th at p. 849, italics added.)

---

undertake those responsibilities under the circumstances of mother's interference are essentially factual.

Here, father impliedly knew that mother was pregnant when they were still together. Father did not present evidence that he promptly demonstrated full commitment to his parental responsibilities within a short time after learning mother was pregnant. He has not pointed to any evidence that he provided mother with emotional, financial, or other practical forms of support while she was pregnant and their relationship continued. Rather, the trial court found father assaulted mother while she was pregnant.

The trial court found that, after father entered residential treatment in October 2013, he was physically unavailable. The evidence also showed that, during that time, father was without means of personally providing financial support to mother. While father did eventually begin taking legal steps to obtain visitation and custody shortly before and after baby was born and demonstrated a desire to discontinue heroin use by successfully completing drug treatment, he later relapsed and began using drugs again.

Father claims he "did nothing to contribute to his inability to attain presumed father status." We cannot agree. He disappeared from his daughter's life after August 2014 and began to use heroin again and he had sought no treatment by the time of the hearing. As this court has previously stated, "[w]e tend to agree that a father whose own bad decisions preclude him from carrying out his parental responsibilities does not satisfy the high bar set by *Kelsey S.*" (*In re D.S.*, *supra*, 230 Cal.App.4th at p. 1246; cf. *Adoption of O.M.*, *supra*, 169 Cal.App.4th at p. 681 "[the mother's] refusal to communicate with [the father] played only a relatively small role in his failure to qualify for *Kelsey S.* rights" and "[f]ar more of the responsibility lies with [the father's] own actions in violating the law"].) "[I]t is not enough to simply file and pursue a legal proceeding; the biological father must establish an 'unequivocal commitment to his parental responsibilities' both before and after the child's birth. (*Baby Boy W.*, *supra*, 232 Cal.App.4th at p. 452.)" (*Adoption of Emilio G.*, *supra*, 235 Cal.App.4th at p. 1147.)

21

Under any applicable standard of review, father has not shown that he promptly came forward and demonstrated a full and continuing commitment to his parental responsibilities within the meaning of *Kelsey S*.

## DISPOSITION

The trial court's order determining that father was not a "presumed father" and terminating father's parental rights is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.



_____

WALSH, J.*




*D.P. et al. v. S.W.*
H041998

_____

 *Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.