Filed 10/27/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.S., a Person Coming Under the Juvenile Court Law. | H039774<br>(Santa Clara County<br>Super. Ct. No. 1-12-JD21412) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A.V.,<br><br>    Defendant and Respondent;<br><br>D.S. et al.,<br><br>    Appellants. | |

This appeal involves competing claims for presumed father status of four-year-old D.S. by the boy's biological father, A.V., and his stepfather, B.E.  The juvenile court ruled that A.V. qualifies as a presumed father under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) and that B.E. is a statutorily presumed father under Family Code section 7611, subdivision (d).[1]  As required by section 7612, the juvenile court weighed those competing paternity presumptions in view of the relevant facts and ruled that A.V.'s presumption was founded on weightier considerations of policy and logic and, thus, controlled.

---

[1] All further unspecified statutory references are to the Family Code.

B.E., D.S., and D.S.'s mother appeal. They maintain the juvenile court erred in ruling that A.V. is a presumed father under *Kelsey S.* and abused its discretion in resolving the conflicting paternity presumptions in A.V.'s favor. We find their first challenge has merit and, therefore, shall reverse with directions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mother and A.V. met in 2009, when mother was 19 years old and A.V. was 45 years old. Mother had just been released from jail and needed a place to stay, so she moved in with A.V., who had an extensive criminal history. Mother began prostituting at A.V.'s request, as she had done in the past. On December 8, 2009, mother and A.V. were arrested for shoplifting. Following that arrest, A.V. remained incarcerated until November 8, 2010. Mother, however, was released on bail.

Mother learned that she was pregnant in February or March 2010 and believed A.V. to be the father. She informed A.V., who was incarcerated, about the pregnancy and sent him an ultrasound picture. Also in approximately March 2010 mother began living with a new boyfriend, B.E.

On July 2, 2010, after mother informed A.V. that California law precluded him from appearing on the baby's birth certificate if he was not present at the birth, A.V. sought to obtain a declaration of paternity form. He never received the form. While A.V. was incarcerated, mother withdrew approximately $100 from his jail account.

D.S. was born in August 2010. B.E. was present at the birth. Mother and B.E. married two months later. Shortly thereafter, on November 4, 2010, mother filed a confidential parentage action naming A.V. as the alleged father. Days later, on November 8, 2010, A.V. was released from custody. After his release, A.V. attempted to file a paternity action, but was informed that a parentage action already was pending. Mother never served A.V. in that action, and apparently nothing happened in the case until A.V. filed a response over a year later, on January 4, 2012.

2

Meanwhile, A.V. saw D.S. on three occasions before he was incarcerated once again in the spring of 2011. During one of the visits, A.V. gave mother $20 for diapers. The first visit occurred in November or December 2010, when mother met A.V. at his request outside a Safeway and let him hold D.S. According to mother, during the third visit A.V. tried to kiss her against her will and made threats against B.E. after that visit.

A.V. was in custody or in drug treatment programs for approximately the second half of 2011, and thus had no contact with D.S. As noted above, A.V. responded to mother's parentage action on January 4, 2012.

Mother had a son, A.E., with B.E. in January 2012.

B.E. was incarcerated between February 5, 2012 and August 12, 2012, for theft. In March 2012, while B.E. was incarcerated, A.V. stayed with mother and D.S. for a few days.

On March 12, 2012, B.E.'s mother (step-grandmother) received a call from mother, who was high, indicating that she could not find her sons. Step-grandmother located the boys, who moved in with her.

On August 7, 2012, A.V. filed a request for genetic testing in the parentage action. He contends he did so because step-grandmother would not let him see D.S.

In August 2012, step-grandmother filed a petition for guardianship of D.S. and A.E. in probate court. The probate court referred the case to the Santa Clara County Department of Family and Children's Services (Department) for a dependency evaluation. The Department filed a juvenile dependency petition on behalf of D.S. on September 11, 2012, alleging that he was at substantial risk of harm due to mother's substance abuse problem. That same day, the Department placed D.S. with step-grandmother.

A detention hearing was held on September 14, 2012. A.V. did not attend. At that hearing, the juvenile court found B.E. to be D.S.'s presumed father under section 7611, subdivision (d). The court ordered that D.S. remain with step-grandmother.

3

On October 30, 2012, A.V. moved to set aside the finding that B.E. was D.S.'s presumed father and requested genetic testing to determine whether he was D.S.'s biological father. The court ordered DNA testing the following day. The DNA test confirmed that A.V. is D.S.'s biological father.

In view of those results, on January 28, 2013, the court found A.V. to be D.S.'s natural father. At the January 28, 2013 hearing, the court admitted into evidence several reports filed by the Department. Those reports indicated that mother and B.E. had tested drug-free at weekly and random tests between October 2012 and January 2013. As of January 2013, mother and B.E. had obtained an apartment together and were employed. It was reported that B.E. was arrested for a domestic violence incident in which he pushed mother on December 23, 2012. Mother later said the incident was a misunderstanding and the charges were dropped.

Over the course of three days in February and March 2013, the juvenile court held a contested hearing regarding A.V.'s motion to set aside the finding that B.E. was D.S.'s presumed father. The court heard testimony from A.V., mother, B.E., and one of mother's friends who testified that she had observed A.V. threaten and push mother during their relationship. Mother confirmed that A.V. had committed domestic violence against her when they were together. On March 19, 2013, the court made a number of factual findings, which are reflected in the factual background set forth above. The court then concluded that A.V. was entitled to presumed father status under *Kelsey S.*, noting that A.V. "has publicly acknowledged his paternity since learning of the pregnancy," "attempted to promptly file a legal action to seek paternity for custody of the child" once being released from prison, "made efforts to visit and have a relationship with the child during the child's first year of life consistent with the limited opportunities to visits afforded by mother and consistent with his own circumstances which included return trips to jail and time spent in various residential drug recovery programs," and "made token efforts to provide financial support for the child." The court found that A.V.'s

4

"efforts to visit [D.S.] were reasonably restricted by mother due to mother's concerns about [A.V.'s] threats of violence against mother's new husband." The court also set aside the prior finding of presumed father status as to B.E. and set the matter for a further contested hearing regarding whether B.E. also was a presumed father.

The hearing on B.E.'s presumed father status was held on May 1, 2013. The court heard testimony and admitted into evidence the Department's addendum report dated May 1, 2013. That report stated that mother and B.E. had successfully completed outpatient drug treatment programs, continued to test drug-free, and were taking a parenting class. As to A.V., the report stated that he too had successfully completed an outpatient drug treatment program and was enrolled in school to obtain his GED. The social worker noted that A.V. did not yet have a relationship with D.S., who did not recognize A.V. during visitation. The report recommended that mother retain custody of D.S. subject to the Department's supervision and that A.V. be granted visitation. At the May 1, 2013 hearing, the court released D.S. to mother and ordered weekly visitation with A.V.

At a hearing on May 14, 2013, the court made findings of fact and determined that B.E. was a presumed father of D.S. under section 7611, subdivision (d) in that "he has received [D.S.] into his home, he has held out [D.S.] as his son and he has demonstrated an abiding commitment to [D.S.'s] wellbeing." Thereafter, the court heard additional testimony and argument as to which of the competing paternity presumptions should prevail. The Department took no position on the issue. At the close of the hearing, the court identified favorable and unfavorable facts related to each presumed father.

As to A.V., the judge noted that he was the biological father, recently had taken a number of positive steps in his life, had visited regularly with D.S. since the court authorized visits, is a registered narcotics offender with an extensive criminal history, had encouraged the mother to engage in prostitution, had engaged in an act of domestic violence against the mother, had offered only "token" financial support for the child, had

5

no present parent-child relationship with D.S., and had previously threatened to hurt B.E. The court opined that A.V. "has not done all that . . . he could have done" to support his son. Addressing A.V., the court stated: "You weren't there for your son" when he was born and "you didn't take all the steps you could have taken" once you were released from custody.

With respect to B.E., the court noted that D.S. viewed him as a father, he assisted mother before and after D.S.'s birth, B.E.'s mother had a close relationship with D.S., B.E. has a significant criminal history that has taken him in and out of D.S.'s life, B.E. is a registered narcotics offender, and B.E. was arrested for domestic violence against mother in December 2012.

On May 28, 2013, the court ruled that A.V.'s paternity presumption was controlling, reasoning that it was in D.S.'s "best interest that he have both [A.V.] and [B.E.] involved in his life . . . to maximize his chance for success" and that having A.V. "as his presumed father and [B.E.] as his stepfather . . . will best ensure that they both are a part of [D.S.'s] life." B.E., D.S., and mother timely appealed.

## II.    DISCUSSION

On appeal, B.E., D.S., and mother contend the juvenile court erred in finding that A.V. qualifies as a presumed father under *Kelsey S.* The Department submitted a letter brief in this matter but took no position on this issue.

### A.    *The* Kelsey S. *Standard*

In *Kelsey S.*, the Supreme Court held that "due process entitles a biological father a meaningful opportunity to qualify as a presumed father." (*In re Jesusa V.* (2004) 32 Cal.4th 588, 601.) While *Kelsey S.* was decided in the context of adoption, appellate courts have extended it to dependency proceedings. (*In re D.M.* (2012) 210 Cal.App.4th 541, 551.)

Under *Kelsey S.*, "[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities--emotional, financial, and otherwise--

6

his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) In the dependency context, this means that a biological father is entitled to presumed father status if he satisfies the requirements of *Kelsey S.* In determining whether a biological father has met the *Kelsey S.* requirements, courts consider all relevant factors, including "[t]he father's conduct both *before and after* the child's birth" and whether he "promptly attempt[ed] to assume his parental responsibilities as fully as the mother [would] allow and his circumstances permit[ted]." (*Ibid.*) "[T]he father must demonstrate 'a willingness himself to assume full custody of the child--not merely to block adoption by others.' " (*Ibid.*) "A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*)

## B.     Standard of Review

"The burden is on a biological father who asserts *Kelsey S.* rights to establish the factual predicate for those rights." (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679.) In reviewing the juvenile court's factual findings with respect to whether A.V. met this burden, we apply the substantial evidence test. (*Id.* at pp. 679-680; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 [the substantial evidence test applies when the party that did not have the burden of proof below contends that the party with the burden of proof succeeded in spite of insufficient evidence].)

Whether those facts satisfy the legal standard established by *Kelsey S.* is a mixed question of law and fact. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 [" 'Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied.' "].) Mixed questions of law and fact are reviewed under the substantial evidence test " '[i]f the pertinent inquiry requires application of experience with human affairs . . . [and] is predominantly factual,' " but are reviewed de novo if " 'the inquiry requires a critical consideration, in a factual

context, of legal principles and their underlying values [and thus] is predominantly legal.' " (*Ibid*.) "[I]n most instances, mixed questions of fact and law are reviewed de novo-- with some exceptions, such as when the applicable legal standard provides for a ' "strictly factual test, such as state of mind." ' " (*Id.* at p. 385.)

The question whether an unwed biological father's actions reflect the level of commitment required to ripen his inchoate constitutional interest into a constitutional right under *Kelsey S.* implicates constitutional and public policy considerations, and thus is a predominantly legal inquiry. (See *People v. Cromer* (2001) 24 Cal.4th 889, 901 [noting that it is the high "court's usual practice" to review "mixed question determinations affecting constitutional rights" de novo].) A number of courts have similarly concluded that whether the facts satisfy the *Kelsey S.* standard is a mixed question to be reviewed de novo, albeit without providing a rationale. (See *Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539 ["To the extent that the issue [of whether a father meets the *Kelsey S.* requirements] is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard"]; *Adoption of H.R.* (2012) 205 Cal.App.4th 455, 468 [same]; *Adoption of O.M.*, *supra*, 169 Cal.App.4th at p. 680 [same]; *Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717-718 [same].)

### C.    Analysis

Here, the relevant facts are largely undisputed. A.V. publically acknowledged his paternity. He sought to take prompt legal action to establish paternity by requesting the requisite paperwork while he was incarcerated and attempting to initiate a paternity action upon his release in November 2010. But his legal efforts stalled in 2011 as a result of his drug abuse and related criminality. A.V. also promptly sought to establish a relationship with D.S. after his 2010 release by arranging three visits with D.S. through mother. However, his efforts to forge a father-son bond were side-tracked for over a year by his behavior, in particular, his attempt to kiss mother against her will, his threats

8

against B.E., and his illegal drug use.  Financially, A.V. provided only token support--approximately $120 over D.S.'s first few years of life.

The parties dispute whether these efforts are sufficient under *Kelsey S.*  A.V. relies heavily on *Kelsey S.*'s directive that trial courts "consider whether petitioner has done all that he could reasonably do *under the circumstances*." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 850.)  He contends that his "criminality and incarcerations," which he acknowledges "interfered with his active assumption of parental duties," constituted his relevant "circumstances."  Given those circumstances, he contends, he did all he could do, thus satisfying *Kelsey S.*  B.E., D.S., and mother respond that A.V.'s own bad behavior cannot excuse his failures as a father.  That argument finds support in *Adoption of O.M.*  There, as here, the biological father's "ability to demonstrate his commitment was impeded . . . by the predictable consequences of his own criminal activity." (*Adoption of O.M.*, *supra*, 169 Cal.App.4th at p. 675.)  The court there concluded that the father had not satisfied *Kelsey S.*, in part, because "his own actions in committing the parole violations, including the use of illegal drugs, [had] led to his incarceration" and prevented him from providing the requisite support to his child.  (*Id.* at p. 680.)

We tend to agree that a father whose own bad decisions preclude him from carrying out his parental responsibilities does not satisfy the high bar set by *Kelsey S.*  But we need not decide whether a father's incarceration is among the relevant *Kelsey S.* "circumstances."  The dependency court itself found that A.V. "ha[d] not done all that . . . he could have done" to support D.S.  That finding is supported by substantial evidence, including evidence that A.V. provided only minimal financial support to D.S., threatened one of D.S.'s caregivers (B.E.), and did not vigorously assert his legal rights until the Department was required to step in to safeguard D.S.'s wellbeing.  *Kelsey S.* explicitly requires that a father prove he "has done all that he could reasonably do *under the circumstances*." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 850.)  The court's finding that, in fact,

9

A.V. did *not* do all that he could have done precludes a finding that A.V. is a presumed father of D.S. under *Kelsey S.* The court erred in ruling otherwise.

Having concluded that the court erred in finding A.V. to be a *Kelsey S.* father, we need not consider appellants' other contentions on appeal.

## III.    DISPOSITION

The juvenile dependency court's orders finding A.V. to be a presumed father of D.S. under *Kelsey S.* and finding that A.V.'s presumption outweighed B.E.'s presumption are reversed. On remand, the court is directed to enter a new and different order finding that A.V. is not a presumed father of D.S. under *Kelsey S.* and awarding B.E. presumed father status. On remand, the juvenile court shall consider whether B.E.'s status as presumed father requires modification of any existing orders related to custody, family maintenance, and the like.

10

_____
                                  Premo, J.

WE CONCUR:

_____
            Rushing, P. J.

_____
            Elia, J.

In re D.S.
H039774

| Trial Court: | Santa Clara County Superior Court |
| | Superior Court No. 1-12-JD21412 |
| Trial Judge: | Hon. L. Michael Clark |
| Counsel for Appellant: | Sixth District Appellate Program |
| L.S.-E. (Mother) | Neale B. Gold |
| Counsel for Appellant: | Sixth District Appellate Program |
| D.S. (Minor) | The Wald Law Group |
| | Deborah H. Wald |
| Counsel for Appellant: | Haworth Law Office |
| B.E. (Step-father) | James W. Haworth |
| Counsel for Respondent: | Sixth District Appellate Program |
| A.V. (Father) | Julie E. Braden |
| Counsel for Plaintiff/Respondent: | No appearance |
| Santa Clara County Department of | |
| Family and Children's Services | |

In re D.S.
H039774