Filed 5/27/16  In re Nikolas G. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re NIKOLAS G., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID M.,<br><br>        Defendant and Appellant. | A146302<br><br>(San Francisco County<br>Super. Ct. No. JD14-3208) |

Appellant David M. is the biological father of Nikolas G. but did not come forward to assert a parental role until the eve of a scheduled hearing to free the minor for adoption.  The juvenile court denied appellant's request to be elevated to the status of a presumed father under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) and terminated his parental rights.  In affirming the order, we reject appellant's arguments that the juvenile court erred in denying him presumed-father status and that appellant received inadequate notice of dependency proceedings.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

S.P. (mother) got married in February 2013.  Her husband was incarcerated later that year, and during his incarceration, from around August to November 2013, mother

1

was involved in a relationship with appellant. According to appellant, he saw mother about once a month during this period, and mother helped appellant move from Redwood City to Corning. He described their relationship as "brief and casual," whereas mother apparently contended they spent longer periods of time together in Corning. Appellant claimed he did not have mother's contact information and that she initiated contacts during this time, whereas mother stated that they both had phones "and his phone number was in my phone, and my phone number was in his phone." Mother became pregnant with Nikolas during her relationship with appellant.

The circumstances of if and when appellant was told mother was pregnant with his child are in dispute. According to appellant, mother's husband contacted him "[a]round October or November of 2013" and stated "that the mother was pregnant with his [the husband's] child and that [appellant] needed to stay away from [mother]." Appellant contends that "[t]he relationship between [appellant] and the mother thereafter ended." Appellant later attested that mother's husband prevented him (appellant) from establishing a relationship with Nikolas by "claiming he was [the] father, the mother stopping all contact with me and I had no way to know where she was, and by her failing to reveal that I was a potential father once a juvenile dependency case was open and she knew her husband was not the biological father of Nikolas via paternity testing."

Mother, by contrast, attested that she informed appellant when she was about one month pregnant that she was carrying his child. According to mother, appellant "was not interested in becoming a father to the unborn baby, and did not assist in the pregnancy in any way." She also stated that appellant knew her husband could not be the biological father because he was incarcerated when Nikolas was conceived. Mother returned to her husband in Redwood City in December 2013 "after [she] was convinced that [appellant] was not interested in being a father to [her] unborn child." Appellant himself was incarcerated from December 2013 to September 2014.

When Nikolas was born in April 2014, he was given the name of mother's husband, and the husband's name was listed on the birth certificate. A few weeks later, mother's husband obtained a DNA testing kit from a pharmacy and learned that he was

2

not Nikolas's biological father. He became upset, shook Nikolas's stroller while the baby was in it, and tried to suffocate mother with a blanket. Shortly thereafter, mother and her husband voluntarily surrendered Nikolas, and a social worker with respondent San Francisco Human Services Agency (Agency) placed the baby in foster care.[1]

Mother reported she could not provide care for her son and needed "to get her life together." She was incarcerated in June 2014. The Agency learned that there was a history of domestic violence between mother and her husband, and there was a restraining order directing the husband to stay away from her. Mother told a social worker that she had experienced "ongoing severe domestic violence" with her husband, who had on different occasions broken her wrist, nose, and ribs.

The Agency filed a dependency petition on June 16, 2014, when Nikolas was about six weeks old, and the infant was ordered detained. Nikolas ultimately was placed with a non-relative extended family member (a friend of mother's sister) and thrived in her care.

Mother told the social worker assigned to the case that a man other than her husband could be Nikolas's father, but the man was someone she had met when she was using drugs, and she did not remember his name or know how to contact him.

On October 15, 2014, the Agency filed a declaration of due diligence summarizing its efforts to search for Nikolas's father, whose identity was then still unknown. Its efforts were somewhat limited, given that the Agency did not know the identity of Nikolas's biological father. A social worker searched databases but did not learn anything new about the father's identity. Another declaration of due diligence was filed on November 10, 2014, after new database searches were undertaken, but there was no new information to report.

---

[1] Mother's husband later requested blood or DNA testing to confirm whether he was Nikolas's biological father, and the test confirmed that he was not. He was thereafter relieved of counsel, was not involved in any further legal proceedings, had his parental rights terminated, and is not a party to this appeal.

Mother signed a form relinquishing Nikolas, and she named his current caretakers as prospective adoptive parents.  In December 2014, the juvenile court sustained an amended count in the dependency petition stating that the current identity and whereabouts of Nikolas's father were unknown (Welf. & Inst. Code, § 300, subd. (g)[2] [no provision for support]).  No reunification services were ordered because mother had relinquished her parental rights and the alleged father's identity and whereabouts were unknown.  Instead, the juvenile court scheduled a selection-and-implementation hearing for April 22, 2015.  Before the scheduled hearing, the juvenile court found that the Agency had exercised due diligence in trying to identify Nikolas's biological father and issued an order dispensing with notice to the unknown parent.

Nikolas's caretakers wanted to adopt him, and the Agency supported the proposed adoption as Nikolas's permanent plan.  In April 2015, the couple filed a request to be named Nikolas's de facto parents, and the juvenile court later granted the request.

According to appellant, mother's husband told him about a week before the scheduled selection-and-implementation hearing that he (the husband) had been ruled out as Nikolas's biological father and that appellant could be the father.  At the time, appellant was unemployed, was living with his parents on a farm in Corning, and was on probation for two charges of firearm possession.  According to the Agency, appellant's girlfriend left multiple voicemails for the social worker assigned to Nikolas's case, represented herself as appellant's wife, and asked for information about dependency proceedings.  The social worker told the girlfriend that she (the social worker) could not provide appellant or the girlfriend with information (other than to confirm an upcoming court date) because they were not parties.

Appellant took steps to become involved in dependency proceedings.  When the social worker first met appellant at court on April 22, she asked him why he had not called her and how he learned that he might be Nikolas's father, and appellant's girlfriend answered for appellant that he was "nervous" and that the person who contacted them

---

**2** All statutory references are to the Welfare and Institutions Code.

4

"preferred to remain anonymous." The social worker described the girlfriend as "very hostile." On April 27, the juvenile court granted appellant's request for a paternity test (which confirmed he was Nikolas's biological father), appointed counsel for him, and continued the scheduled selection-and-implementation hearing to June 3.

Two days before the scheduled continued hearing, appellant filed an objection to the proposed adoption. In that motion, he asked to be found Nikolas's presumed father or, in the alternative, a father under *Kelsey S.*, *supra*, 1 Cal.4th 816 ("*Kelsey S.* father"). He further requested that Nikolas be immediately placed with him or that the court order reunification services for him. Appellant also filed a motion under section 388 requesting essentially the same relief: that he be named Nikolas's presumed father or a "*Kelsey S.* father*," that Nikolas be immediately placed in his care, or that he be provided with reunification services. Later, appellant filed a motion to set aside previous orders and to return Nikolas's case to the disposition hearing based on allegations of "defective notice," claiming that the Agency did not do enough to learn his identity. The Agency and the de facto parents opposed all of appellant's requests. On June 3, the juvenile court elevated appellant's status to that of Nikolas's biological father and continued the matter a few times in order to consider appellant's more substantive requests.

Further investigation by the Agency revealed that appellant was arrested multiple times beginning in 2004 for the use and sale of controlled substances, was convicted in 2005, 2007, 2008, 2010, and 2011 for various misdemeanor and felony drug counts, and was convicted in 2014 for felony possession of a loaded firearm and sentenced to one year in jail and three years on probation. Appellant was registered as a gang member, was with other gang members the last time he was arrested, and recently was found with clothing that was of the color associated with his gang. Appellant's probation officer described appellant as "guarded and closed off" and reported that appellant "does not talk much when they meet." The Agency also learned that appellant's girlfriend had multiple referrals to child protective services regarding her own two children and had an open case in Sacramento County in which she had not participated in any services. The Agency had difficulty further evaluating appellant because he reportedly was resistant to meeting with

5

the social worker and refused to participate in a mediation to discuss a possible post-adoption contract with the prospective adoptive parents.

At the continued hearing on July 29, 2015, the parties' attorneys briefly argued their respective positions, but no witnesses testified and no additional evidence was submitted. The juvenile court denied all of appellant's requests. It concluded that the Agency acted reasonably to locate appellant on the information it had and that appellant "did not come forward for quite a long period of time after he knew or reasonably should have known there was a great possibility that he's the biological father of this child." The court further denied appellant's request under section 388, finding there was no showing of changed circumstances or that the requested change to court orders would be in Nikolas's best interest. And the court concluded that father did not qualify as a *Kelsey S.* father because "he did not come forward for that significant period of time. I believe it was close to 18 months once he knew or should have known he had a great probability of being the father of this child."

The juvenile court proceeded to the selection-and-implementation hearing and terminated the parental rights of mother, mother's husband, and appellant, and it ordered adoption as Nikolas's permanent plan.

## II.
### DISCUSSION

Appellant argues that the juvenile court erred when it denied his request to be recognized as a *Kelsey S.* father, but he is mistaken. " 'The Uniform Parentage Act (UPA), Family Code section 7600 et seq., provides the statutory framework for judicial determinations of parentage, and governs private adoptions, paternity and custody disputes, and dependency proceedings.' [Citation.] 'The UPA distinguishes between "alleged," "biological," and "presumed" fathers.' [Citation.] 'Presumed father status ranks highest.' [Citation.] '[O]nly a presumed . . . father is a "parent" entitled to receive reunification services under [Welfare and Institutions Code] section 361.5.' [Citation.]" (*In re D.A.* (2012) 204 Cal.App.4th 811, 824.)

6

Under *Kelsey S.*, *supra*, 1 Cal.4th 816, due process requires a biological father to be considered a presumed father if he satisfies certain requirements. (*Id.* at p. 849; *In re D.S.* (2014) 230 Cal.App.4th 1238, 1244 [*Kelsey S.* decided in adoption context and later extended to dependency proceedings].) Courts look to whether the father "promptly comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise," and they should consider "[t]he father's conduct both *before and after* the child's birth." (*Kelsey S.*, at p. 849, original italics.) "Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*) The burden is on the biological father who asserts *Kelsey S.* status to establish the factual basis for those rights, and we review the juvenile court's factual findings for substantial evidence. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679-680.)

In arguing that he qualifies as a *Kelsey S.* father, appellant focuses on the steps he took *after* he was told in April 2015 he might be Nikolas's father to become part of his son's life. A fair reading of the record indicates it was actually appellant's girlfriend who was more motivated to become involved in dependency proceedings. But even putting that aside, mother's declaration shows that *before* Nikolas was born mother told appellant that he was the baby's father, yet appellant showed no interest and did not help during her pregnancy in any way. It was only after mother was convinced that appellant was not interested in being a father that mother returned to her husband.

Appellant acknowledges that if mother's statements are true, then he does not qualify as a *Kelsey S.* father. While not directly contradicting mother's version of events, he argues that the facts in mother's declaration "are not reasonable, credible, or of solid value," because their truth cannot be reconciled with the fact she told her husband

7

throughout her pregnancy and for several weeks after Nikolas was born that he (the husband) was the biological father. But we are hardly surprised that mother would be less than forthcoming with a man with whom she had a history of "ongoing severe domestic violence." And while it is true (and unfortunate) that mother apparently also withheld information from the Agency about appellant's identity, there is nonetheless substantial evidence to support the implied findings that appellant knew mother had been pregnant with a child who she had said was his, had mother's contact information, and nonetheless did not timely come forward to assume parental responsibilities. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

This case is readily distinguishable from *In re D.A.*, *supra*, 204 Cal.App.4th 811, upon which appellant relies, because there the biological father took reasonable steps to assume a parental role by taking the mother to prenatal medical appointments, offering to help with any pregnancy-related expenses, repeatedly trying to reach the mother by calling a maternal aunt after mother broke off contact, begging to meet his son after he was born, and requesting a paternity test and visitation after he did meet him. (*Id.* at pp. 814-815, 824-825.) Here, appellant took no such similar steps to assume a parental role after mother broke off contact with him (something she said she did only after appellant stated he was not interested in being a father).

We also reject appellant's arguments regarding his notice of the proceedings. (§ 316.2, subd. (b) [alleged fathers entitled to notice that child is subject to dependency proceedings].) According to appellant, the Agency did not do enough to identify him and should have asked mother's husband to identify potential biological fathers. He goes so far as to claim that mother's husband "was the *most likely* source of information as to who might have fathered a child with his wife, during their marriage." (Italics added.) This is not a reasonable reading of the record, given that the husband apparently was incarcerated during most of mother's relationship with appellant, the husband believed he himself was the biological father until genetic testing proved otherwise, and mother told a social worker that she could not remember the name of a possible father because she was on drugs when she was with him. Under the circumstances known to the Agency,

8

husband did not appear to be a likely—let alone the "most likely"—person to provide information about appellant's identity, even though it was later revealed that he did in fact have this information. The cases upon which appellant relies in arguing he received inadequate notice of the dependency proceedings are easily distinguishable, because they involved situations where the social services agencies *knew the identity of the parents* but failed to take reasonable steps to learn their whereabouts. (*In re Arlyne A.* (2000) 85 Cal.App.4th 591, 593, 598-599 [social services agency knew father's identity but ignored timely and correct information about his whereabouts and failed to take direct steps to reach him]; *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 103, 108-109 [agency asked father about mother's whereabouts but did not ask for information about mother's relatives, who knew how to contact mother].)

Finally, we reject appellant's argument that the juvenile court violated his constitutional rights by denying his section 388 petition without a finding of parental unfitness. He was entitled to such a determination only if he was found to be a *Kelsey S.* father (1 Cal.4th at p. 849), and we already have concluded that he did not qualify as one.

### III.
#### DISPOSITION

The juvenile court's order terminating appellant's parental rights is affirmed.

_____

Humes, P.J.

We concur:


_____

Dondero, J.


_____

Banke, J.

*In re Nikolas G.* (A146302)

10