Filed 10/14/21  In re C.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.S., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076571 |
| Plaintiff and Respondent, | (Super.Ct.No. J281783) |
| v. | OPINION |
| P.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Conditionally reversed with directions.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

1

A child tested positive for methamphetamine at birth. Her birth certificate listed no father. In the subsequent dependency, her mother failed to reunify with the child and a hearing to terminate parental rights was set. Then, at a notice review hearing, a man appeared in court, stated that he might be the baby's father, and requested a paternity test. The test results, filed the day before the hearing to terminate parental rights, revealed he was the baby's father, so at the hearing, he requested a continuance. His apparent goal was to demonstrate that he was a presumed father, not just a biological one, and thus entitled to greater protections against the termination of parental rights. The juvenile court denied the continuance request and proceeded to terminate both his and the mother's parental rights without determining whether he was a presumed father.

On appeal, the father contends he never received the required statutory notice under Welfare and Institutions Code section 316.2. We requested supplemental briefs addressing whether the juvenile court erred in denying the father's continuance. We find that the continuance denial was an abuse of discretion and conditionally reverse.[1]

## I. BACKGROUND

B.S. (mother) gave birth to C.S. (child) in July 2019. Both tested positive for methamphetamine. Within days, plaintiff and respondent San Bernardino County Children and Family Services (CFS) filed a section 300 petition alleging, among other things, a failure to protect the child due to mother's substance abuse. (See § 300, subd. (b)(1).) At the detention hearing, mother identified a man named Joshua as the father,

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

and when asked by the court whether anyone else could be a father, she additionally identified a man named Russell. She did not identify defendant and appellant P.R. as a father. The child's birth certificate lists no father. Although the section 300 petition named Joshua as an alleged father and made allegations against him as well, the juvenile court later found him to be a nonparty. Neither Joshua nor Russell is part of this appeal.

At a combined jurisdiction and disposition hearing in October 2019, the juvenile court ordered family reunification services for mother. At the six-month review hearing, CFS reported that mother never submitted to drug testing or engaged in court ordered services, so the court terminated the reunification services. Mother also is not part of this appeal.

P.R. (father) first appeared in court at a September 2020 notice review hearing. When the court asked whether it was possible he was the child's father, he answered yes. The court appointed counsel for father and ordered paternity testing. The court also informed father that the section 366.26 hearing to terminate parental rights over the child had been scheduled for January 2021.

A. *The January 2021 Section 366.26 Hearing*

In its report submitted for the section 366.26 hearing, CFS stated that father had not completed testing and that he had notified CFS in November 2020 "to report he had not been able to contact his attorney to arrange the paternity test."

At the hearing, father requested more time to get tested, contending that although CFS was supposed to contact him and arrange for testing, it never did. The juvenile court allowed father to testify so that it could determine whether father or CFS had "dropped the ball" as to testing.

Father testified that he was told he would be contacted with instructions as to how to get a paternity test where he lived in Arizona, but no one ever contacted him. On direct examination, he stated to his counsel: "I made contact with your office, and you got back to me. I made contact with County Counsel and also with child services. Basically, I was told I was doing everything I was supposed to be doing, but nobody could tell me where I was supposed to go for paternity testing or what the issuing party would be."

Importantly, father was asked about his knowledge of (and attempts to contact) the child. The following exchange took place on direct examination:

"Q. Now, when did you first find out that you were possibly—or that this lady had a baby?

"A. I found out she had a baby—I found out she was pregnant, I want to say—oh, geez. Well, I understood she was pregnant. I'm not sure of the time frame, but it was prior to her having had the child.

"Q. Have you—did you speak to her in July of 2020?

"A. Yes, I did.

"Q. And tell us the substance of that phone call.

4

"A. Well, she had contacted me, and, basically, had asked me if I remembered about when we started hanging out, and I was like, 'Well, not off the top of my head. Why? What's up?' And she sent me a picture of the child. When she did that, I pretty much figured out what she was getting at, and then did the numbers in my head after I asked her how old the child was. And I was like, 'Well, yeah, actually, that is very possible.'

"Q. Did you ever ask her if you could see the child?

"A. I was, kind of, getting towards it, but she had informed me that she did not have the child. That the child was not in her custody. That CPS [*sic*] had been involved and gave her an opportunity to leave the child with a family member.

"Q. Did you find out who that family member was?

"A. Yes. Her niece.

"Q. Did you contact that family member?

"A. I attempted to on Facebook. I sent them a message, basically, asking about the next court date, like when it was so I could be present. And, to my understanding, they never even read the message. I was never responded to. I was never told anything, and so I, basically, tried my best to figure out who [mother's] case manager was from the time she told me, and I have been in contact with her until I came here in September when you were assigned to me as my attorney. I have been in contact with your office trying to leave it as a court matter, not trying to go beyond my means, like just showing

up randomly at somebody's house. And I'm allegedly the father, so that can be looked at—I don't know. I might take it the wrong way. I mean it's—

"Q. Do you want to be recognized as the father?

"A. If she is my child, yes, sir."

Following additional testimony from father and argument from the parties, the juvenile court continued the hearing until the following month to allow father to get tested. Before making its ruling, however, the court expressed concern that father's appearance may have been part of a tactic to delay the termination hearing, emphasized the fact that father knew mother was pregnant, and stated its belief that the results of the paternity test would ultimately make no difference. It stated: "My recollection . . . was that there was going to be an issue of where [d]ad tested because he was out of state, and the [d]epartment was going to help set that up. So that is kind of—now it sounds like the [d]epartment wasn't really aware of that. I have all the great concerns that—you know, I frankly, have a doubt that he is even the father, and it sounds like this smacks of the typical, [m]other's-time-ran-out-and-now-they're-going-to-terminate-parental-rights-so-let-me-find-a-guy-and-here-he-comes-and-delay-delay-delay tactic. And he is not even a *Kelsey S.* father because there was an indication he knew when she was pregnant but didn't take action at all.[2] So, you're right. There is no FR. There is nothing like that. There is no 388. He is not even taking action now, right?

---

**2** In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*), our Supreme Court considered "whether the father of a child born out of wedlock may properly be denied the right to withhold his consent to his child's adoption by third parties despite his diligent

"But the law does require that when they come forward, we're supposed to determine who the natural father is. That's in the law. And I ordered that. And, you know, what I'm gathering from the [d]epartment is they didn't understand that they were supposed to give him a referral for where to test, and they had contact with him, so that is kind of my dilemma. I don't think it affects the outcome of the case, based on everything I've just said. I don't think it affects the outcome of the case, but I think I'm required to make that determination, or try to, before I do the .26."

   *B. The February 2021 Section 366.26 Hearing*

The day before the rescheduled section 366.26 hearing, CFS filed the results of the paternity test, which stated that father's probability of paternity was 99.99%.

At the hearing, father's counsel stated that father was running late because he was driving in from Arizona. Father's counsel requested a continuance, stating that father wanted to get custody of the child and expressed interest in taking an active role. The juvenile court noted that "I did take testimony last time from him" and that "I don't think I believed that he was a *Kelsey S.* father[.] I don't think there is evidence of that." When the court asked father's counsel whether he had "something to support that" he might be a *Kelsey S.* father, counsel replied no.

---

and legal attempts to obtain custody of his child and to rear it himself, and absent any showing of the father's unfitness as a parent." (*Id.* at p. 821-822.) It held that, "under these circumstances, the federal constitutional guarantees of equal protection and due process require that the father be allowed to withhold his consent to his child's adoption and therefore that his parental rights cannot be terminated absent a showing of his unfitness . . . ." (*Id.* at p. 822.) "While *Kelsey S.* was decided in the context of adoption, appellate courts have extended it to dependency proceedings." (*In re D.S.* (2014) 230 Cal.App.4th 1238, 1244.)

A brief time later, the court stated: "I think I commented before I did not believe he was a *Kelsey S.* father, or that he met that standard. I still believe that today. And the child has been with this prospective adoptive family now, and it's not in the best interest to break that bond with who the child really knows as her parents. [¶] . . . [¶] And I think the child's been there since about two, three weeks old. So that is the child's home. That's the child's parent. That's who the child—it would be a severe detriment to the child to remove now and delay the case and chances for permanence on the off chance that [d]ad might be able to do something to get the child back. It seems unfair to the child to their stability to do that." On that basis, it denied father's request for a continuance. It proceeded to terminate mother and father's parental rights over the child.

## II. ANALYSIS

Father contends on appeal that the undisputed failure to provide him with statutorily required notice under section 316.2 requires reversal. Following oral argument, we asked the parties to submit supplemental letter briefs addressing the unbriefed issue of whether the trial court erred in denying father's request for a continuance at the February 2021 section 366.26 hearing. We conclude that the denial was an abuse of discretion.

"The juvenile court has the power to 'control all proceedings during the hearings with a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the person upon whose behalf the petition is brought.' [Citations.] Although

8

continuances are discouraged in dependency cases [citation], the juvenile court may continue a dependency hearing upon a showing of good cause, provided the continuance is not contrary to the interest of the child.  [Citations.]  We review an order denying or granting a continuance for abuse of discretion."  (*In re Emily D.* (2015) 234 Cal.App.4th 438, 447-448.)  "[W]hen a trial court's decision rests on an error of law, that decision is an abuse of discretion."  (*People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 746.)

Here, the trial court denied father's request for a continuance at the February 2021 hearing because it concluded that father was not a *Kelsey S.* father.  This conclusion was in turn based on its statement, made at the January 2021 hearing, that "there was an indication [father] knew when [mother] was pregnant but didn't take action at all."  We believe this is based on a misreading of *Kelsey S.*; information triggering a father's *Kelsey S.* duties should include information indicating a father knew of the pregnancy as well as some reason to know that the child is his.  After properly taking *Kelsey S.* into account, there is simply too little information on this record to determine one way or the other whether father ultimately could satisfy *Kelsey S.*

In *Kelsey S.*, our Supreme Court held that a biological father who "promptly comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise" has a due process right against "allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)  As it went on to explain, a court should consider

9

"all factors relevant to" whether a father has met this standard. (*Ibid.*) "The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*, fn. omitted.)

Seeming to rely solely on the fact that father was aware that mother was pregnant at some point before the child was born, the juvenile court stated at both section 366.26 hearings that father was not a *Kelsey S.* father. In our view, however, when *Kelsey S.* makes reference to the point in time when a father "knows or reasonably should know of the pregnancy," it refers to when the father both knew or should have known the mother was pregnant *and* had some reason to know that the child was his. In *Kelsey S.*, this inquiry was uncomplicated; the mother and father were not married, but there was no dispute that the father knew, as soon as he learned of the pregnancy, that it was *his* child that the mother planned to place for adoption. (*In re Kelsey S.*, *supra*, 1 Cal.4th at p. 822.) Here, the situation is more complicated, or at least the record is undeveloped. Father testified that he had learned mother was pregnant at some point before the child's birth. But there is nothing in the record showing, for example, that he also learned at that

10

time how far along the pregnancy was, so as to trigger some question in his mind as to whether he might be the father. Indeed, his testimony was that he only had cause to think about the relevant timelines (when he "did the numbers") after the child's birth. Nothing in the record shows that this was any sort of unreasonable delay on his part.

This case is unlike *In re Zacharia D.* (1993) 6 Cal.4th 435, where the record showed that (1) the father engaged in at least a dozen acts of sexual intercourse with the mother over a two week period, (2) the father testified that the possibility of the mother being pregnant with his child "'didn't occur to [him],'" (3) the father knew where the mother was living and "'could have found her,'" (4) the father "had not requested that [the child] visit him in jail, request[] any reunification services, or taken either a parenting or drug rehabilitation class" even after filing a complaint to establish a parental relationship, and (5) the father's "articulated impetus for coming forward was not one based on [the child's] needs and interests, but rather on [the mother's] impending loss of parental rights." (*Id.*, *supra*, 6 Cal.4th at pp. 442-443, 452, 455.) On those facts, the Supreme Court concluded that the father was not a *Kelsey S.* father.

The facts here are quite different, to the extent they can be determined from the undeveloped record. We have practically no information on father's "emotional" or "financial" commitment toward nurturing a parental relationship with the child. (See *Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) What information there is, however, suggests that father was willing and able to do what he could to establish the relationship. After the child had been born and mother sent father a picture of the child, father asked mother

11

how old the child was and "did the numbers in [his] head." After realizing that it was "very possible" he was the father, father attempted to contact mother's niece, who was caring for the child. When he did not receive a response, he contacted mother's case manager. He then personally appeared at a live court hearing, despite living in Arizona, and asked for a paternity test. Father then sought to get tested but could not, and the court later concluded, it seems, that the failure to test was not father's fault. At the February 2021 hearing, father attempted to drive in from Arizona again.[3] Although more information is needed in order to fully determine whether father "demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise," the steps father has taken so far do suggest, at a minimum, "'a willingness himself to assume full custody of the child—not merely to block adoption by others.'" (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

We place no stock in the fact that, at the February 2021 hearing, the court asked father's counsel whether he had "something to support that" father was a *Kelsey S.* father, to which counsel replied no. By that point, father's counsel had already sought a continuance, noting that father wanted to get custody of the child and had expressed interest in taking an active role. A continuance may have helped gather additional information on father's ability to establish presumed father status under *Kelsey S.*, information that counsel would not have had ready to present to the court at a hearing taking place one day after positive paternity test results were filed.

---

[3] Because the hearing appears to have concluded before father appeared, it is not clear whether father ever reached the courthouse.

12

Because the juvenile court denied father's request for a continuance at the February 2021 hearing based on an incorrect reading of what *Kelsey S.* requires, its ruling was based on an error of law and was thus an abuse of discretion. (*People v. Superior Court (Humberto S.)*, *supra*, 43 Cal.4th at p. 746.) Accordingly, we conditionally reverse to allow father to present to the juvenile court whether he is a *Kelsey S.* father, entitled to reunification services and custody, or otherwise entitled to other relief. (See *In re Zacharia D.*, *supra*, 6 Cal.4th at pp. 454-455 [reviewing father's request for custody and visitation rights to child even while noting that "a biological father is not entitled to custody under section 361.2, or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period"].) Although "[w]e recognize and regret the procedural and emotional difficulty of undoing this fundamental error at this stage of the process," "we cannot allow the process to continue on the path toward termination of parental rights without further review in the trial court." (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1215.)

### III.  DISPOSITION

The order terminating father's parental rights is conditionally reversed, and the matter is remanded to the juvenile court for the limited purpose of determining whether father is a presumed father or entitled to other relief.  If the juvenile court determines that father is not a presumed father or entitled to other relief, the order terminating father's parental rights shall be reinstated.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>RAPHAEL</u>
J.

We concur:

<u>RAMIREZ</u>
P. J.

<u>McKINSTER</u>
J.