Filed 10/17/25  In re F.W. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re F.W., a Person Coming Under the Juvenile Court Law. | B340312 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 23CCJP03924) |
| Plaintiff and Respondent, | |
| v. | |
| DANIELLE W., | |
| Defendant and Appellant; | |
| JUSTIN S., | |
| Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Linda Sun, Judge.  Affirmed.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Senior Deputy County Counsel for Plaintiff and Respondent.

Jack A. Love, under appointment by the Court of Appeal, for Respondent Justin S.

———————

Danielle W. (mother) challenges orders of the juvenile court sustaining a dependency petition as to her daughter, F., removing F. from mother's custody, and placing F. with her biological father, Justin S. (father). We find no error, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Detention and petition.

Mother and father are the parents of F., who was born in June 2021. When this case began, mother and F. were living in a shelter in Los Angeles, and father was living in San Diego.

In October 2023, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that mother was mentally ill and was neglecting F. A shelter case manager told a DCFS social worker that mother "tend[ed] to go off on paranoia tangents that someone is watching her or is out to get her." Mother said that she had moved to Los Angeles four years earlier at the insistence of maternal grandfather and another man, Jason, with the involvement of the CIA. Mother acknowledged that the maternal grandfather was dead, but she

2

believed he was still working undercover for a government agency. Mother had lived with her family in Utah before coming to Los Angeles, but said she was not currently in contact with them because everyone in her family had "undercover jobs she doesn't know about." She claimed to see her deceased father and siblings who lived out-of-state driving around Los Angeles.

Mother said that people she knew talked to her in her head. She denied that the voices she heard ever told her to hurt F., but she believed the voices told F. to hurt herself. Mother acknowledged having a family history of schizophrenia, but said schizophrenia was " 'a disease created by the government to fuck with people,' " not a " 'real illness.' "

Mother said she had had therapy many times, most recently four years earlier. She had never stayed in therapy long enough to receive a formal diagnosis. Mother said " 'they' " were trying to diagnose F. with autism, and other children in the complex were teaching F. bad things because they gave F. hugs.

Several members of mother's extended family said there was a family history of schizophrenia, and mother had experienced significant trauma, including childhood sexual abuse. Mother's siblings expressed concern about F.'s safety in mother's care.

Mother's case manager said mother previously had been diagnosed with bipolar disorder and schizophrenia. The case manager believed mother took good care of F., but that F. was very isolated because mother believed the CIA would kidnap F. if she were placed in childcare.

Mother's former therapist said mother had had prolonged periods of psychosis and suffered from schizophrenia or schizoaffective disorder.

In November 2023, DCFS filed a petition alleging that mother suffered from bipolar disorder, schizophrenia, and delusional and irrational thought processes, for which mother had not sought treatment and which rendered her unable to safely care for F. DCFS recommended that F. remain in mother's care with family preservation services.

At a December 2023 detention hearing, mother for the first time identified father as F.'s biological father. The court found a prima facie case that F. was a child described by Welfare and Institutions Code[1] section 300, subdivision (b), and it ordered F. released to mother with family preservation services.

## II.   Jurisdiction.

In January 2024,[2] mother reported having called the suicide hotline once when she lived in Texas, but said she had never tried to hurt herself. She said she would like to kill the people who were trafficking her and F., and she identified those people as the police, the government, the FBI, and St. Joseph's Medical Center. Mother said that at her last meeting at St. Joseph's Medical Center, she had been told she needed to get a babysitter, which she took to mean the hospital wanted to traffic F. She believed F. had been molested and that "someone" was trying to sell her.

Mother acknowledged that hearing people talking to her in her head sounded crazy, but said she "underst[ood] how this can happen" after a friend "explained FBI technology." Mother said

---

[1]   All subsequent statutory references are to the Welfare and Institutions Code.

[2]   All subsequent events occurred in 2024 unless otherwise indicated.

4

the voices sometimes said, " 'It's time,' " which she understood to mean that " 'it's time for her to have sex with the person next to her' and that this is how she is being trafficked." Mother said that when she came to California from Texas, the songs on the radio told her, " 'You belong in Hollywood. You are a super assassin. We have a job for you.' " Mother also said she couldn't go anywhere because she was doing scenes for a movie, and that " 'Whoever is harming F[.] must be doing it to other children and must be stopped."

Mother reported that her friend Jason had "sent her a message through her head instructing her to have sexual relations with [father]," and thus the sex had not been consensual even though it appeared to be. Mother believed father worked undercover for the government and had deliberately failed to wear a condom so she would get pregnant. Mother also believed that Jason and maternal grandmother were capturing her sex life through her head and were trying to make a movie about her sex life without her consent. She said her father was pretending to be dead and had a fake funeral, but that she saw her father and Jason "driving around checking up on her."

Based on the foregoing, DCFS opined that although there was no indication that mother's auditory hallucinations had instructed her to harm F., mother "admitted to engaging in sexual activity against her wishes because the voices told her to," and thus "[t]he possibility of mother engaging in conduct that is risky, harmful or detrimental to F[.] at the command of the voices exists." Further, mother's "non-compliance with mental health services and psychotropic medication coupled with her chronic homelessness not only limit her ability to parent F[.] but also her ability to provide a stable and nurturing home environment in

which F[.] could thrive."  DCFS thus recommended that the petition be sustained and mother be provided with family maintenance services.

Mother underwent a psychiatric evaluation in late January.  The evaluating psychiatrist said mother reported hearing voices that told her to hurt F., but said she had never done so.  The psychiatrist believed that F. was at risk in mother's care, and he urged DCFS to step in until mother was on medication and stable.  The same day, the psychiatrist placed mother on a psychiatric hold, and F. was detained and placed in foster care.

The social worker obtained a contact number for father and spoke to him in January.  Father said he and mother met during the summer of 2020 and had a few sexual encounters over several days.  A few weeks later, mother contacted him and said she was pregnant and that either father or another man was the father of the unborn child.  Father said he had no further contact with mother and had never met F.  Father clarified that he was not trying to avoid responsibility if F. was his child, but could not assume paternity without a DNA test.

Father subsequently shared with the social worker two text threads between himself and mother.  The November 2020 thread was as follows:

"[Mother:]  Bad news.  I'm pregnant.  I don't know for sure if it's yours it might be this other guy[']s.  To avoid all the drama and shit that goes into finding out, I just want to have an abortion.  I'm completely broke . . . .  Other dude is refusing to help or even speak to me.  If there's any way you can send me a Venmo, that would be great[ly] appreciated.  Plan C is [$]240 if I get it fast, or [$]120 if I take a little longer."

"[Mother:]  I'm just estimating your 18 years of child support and it came out to $216,000.  [¶]  You can get out now for a one time fee of $120[.]  [¶]  Think about it."

"[Father:]  If you legit needed some help [I] would have been willing to help you.  This is not how you do it."

"[Mother:]  I'm not trying to do crap to you but you did ignore me and you have no idea what I've been through over the last two weeks if you were puking your guts out you might lose patience and get a little mean as well.  [¶]  And that is what it took for you to respond to me so I don't really feel that bad about it.  [¶]  I already apologize[d] for being rude and honestly that's the least of our problems with this.  [¶]  I truly am sorry."

"[Father:]  I'm done here.  Contact me when you have the test."

"[Mother:]  You know [w]hat just don't worry about it[.]  I'll hit you up at nine months if the baby turns out to be brown."

Mother and father exchanged additional texts in March 2021, as follows:

"[Father:]  I'm only focused on trying to do what's in the best interest of a child who is potentially mine.  There is no sense in making this worse.  I don't care if you feel nothing for me, I understand and have accepted that possible reality.  My interest here is purely for the confirmation of and wellbeing associated regarding a child that I may share with you.  This is a serious matter for me, I'm only asking for your continued cooperation.  [¶]  Have you been able to confirm whether it is a he/she?  [¶]  I'm at peace with you Danielle, just asking you to cooperate with me."

"[Mother:]  I am disinclined to acquiesce to your request[.]  [¶]  It's a girl[.]  [¶]  You're a little late to this party to be asking

7

me for shit[.]  [¶]  The only reason there's not a paternity test already is because you weren't around[.]"

"[Father:]  Understand, I am happy.  [¶]  Did you test the other guy you mentioned? . . .  [¶]  I don't hate you nor am I angry.  More caught off guard than anything.  [¶]  In the event this is a child I . . . share with you, I will be a part of her life.  [¶] All I'm asking is just to confirm it for sure[ ] without you making it hard for me to be in her life and I will be there."

"[Mother:]  I don't agree to anything.  [¶]  You were not in the picture this morning.  I have no idea how your actions will be in the future.  You will not get my cooperation by asking for it. [¶]  Make arrangements for your paternity test and I will show up.

"[Father:]  Danielle, please understand.  I'm here in an honest effort to make this work with you.  That is my intent.  [¶] Again, I don't intend to leave a child of mine behind.  [¶]  That is not who I am."

On January 24, father appeared at the detention hearing and requested a DNA test and visitation pending the DNA test results.  Through counsel, mother requested that F. be released to her care at the conclusion of her psychiatric hold.  Minor's counsel and DCFS requested that F. remain detained from mother.

The court found that it would be contrary to F.'s welfare to remain in mother's care.  It thus ordered F. detained in foster care, ordered paternity testing, denied father's request for visits pending receipt of the results of the paternity test, and granted mother monitored visits.

In February, it was reported that F. engaged in many concerning behaviors.  Specifically, F. hit herself in the face when

8

upset; ate sand and small rocks; seldom exhibited social smiles; had a flat affect; appeared distressed during transitions or when in noisy places; held her lips open with her tongue protruding most of the time; did not play with other children; did not understand verbal instructions; did not engage in age-appropriate play; and exhibited distress if her caregiver was out of sight. F. was diagnosed with an auditory processing disorder and with gross motor, problem solving, and social delays. It was recommended that F. be enrolled in preschool and receive early childhood mental health supportive services.

F. was also determined to have significant dental decay over most of her teeth. A pediatric dentist said F. needed to have her four front teeth removed and cavities filled in other teeth. She would also need a dental bridge after her front teeth were removed.

Mother and F. had a monitored visit in early February. When the monitor first arrived, F. clung to her caregiver and cried for about 20 minutes. F. did not display any emotion when she saw mother, but became warmer toward her as the visit progressed. F. cried when the visit was over. F. appeared to have no emotional reaction the next time she saw mother, and she did not seem upset when it was time to leave.

In February 2024, mother disclosed that since her discharge from the psychiatric hospital, she continued to hear voices, including one voice telling her to hurt F. Mother emphasized that she loved F., had no control over what the voices said to her, and would never act on an instruction to hurt F. Mother attributed the voices to " 'government technology.' " Mother also insisted that there were voices in F.'s head. Mother

said: " 'I can't get them to listen to me or shut up when I tell them to. Whoever is doing this is not going to stop.' "

In April, results of DNA testing indicated that father was F.'s biological father.

Mother underwent a second psychiatric evaluation in April. Mother told the psychiatrist that she did not believe she had schizophrenia, which she described as a "poison by the government for entertainment," and that she had been prescribed an antipsychotic medication but refused to take it because she didn't want to gain weight. The psychiatrist diagnosed mother with schizophrenia and described her as actively psychotic with command auditory hallucinations and complex paranoid delusions. The psychiatrist opined that mother's "severe untreated psychotic symptoms interfere with her ability to parent her young child" and that mother "has no insight into her diagnosis and refuses medications to treat her psychosis." The psychiatrist recommended antipsychotic medication, preferably by injection; and opined that "[a] minimum of six months of continuous treatment is necessary before reevaluation to assess her mental state stability, compliance, and insight into her disorder and her attitude toward medications."

The juvenile court sustained the dependency petition in April, finding: "Mother's mental health condition has been adequately reported by two doctors who expressed grave concerns over the mother's ability to care for the child. We don't need . . . to have proof that the mother has actually harmed the child due to her . . . auditory hallucinations. [¶] There is a . . . future risk of harm to the child in that both of these doctors reported that the mother has an active and fluid psychosis." Father was

deemed F.'s biological father and was granted monitored visits with F.

### III.   Disposition.

DCFS assessed father's home in May and determined it to be appropriate.  The same month, father took the train from San Diego to Los Angeles and had a monitored visit with F.  The social worker reported that father greeted F. with a hug and kiss, and the two drew on the sidewalk with chalk.  F. reportedly was very comfortable with father, asked him a lot of questions, followed his directions, and "planted herself on father's lap" when he sat on the grass.  F. called father " 'Daddy' " and got upset when father did not pay attention to her for a couple of minutes because he was speaking to the social worker.  Father said he was happy to be in F.'s life and would add F. to his medical coverage so she could get appropriate dental care.

Father denied that his sexual contact with mother had been nonconsensual, as she alleged.  After an investigation, DCFS assessed that mother's allegation that F. was conceived as the result of nonconsensual sexual intercourse was "not supported by the investigative findings and appear[ed] to be a byproduct of her untreated mental illness"—namely, mother's belief that voices in her head had instructed her to have sexual relations with father.  It recommended that F. be released to father with family maintenance services, and that mother receive family reunification services.

Father had a second three-hour monitored visit with F. in June.  Father had brought coloring supplies, and he and F. colored, played on playground equipment, and ate lunch together. F. reportedly responded well to father.

11

Mother reported being in compliance with her medication regimen, but the social worker believed it was not benefiting mother because she continued to talk about the FBI and government conspiracies.

On June 14, 2024, F. had an overnight visit with father at his home. At the beginning of the visit, father carried F. inside, and F. seemed comfortable with father. The next day, F. cried when it was time to leave father and said, " 'I don't want to go.' " Father responded appropriately.

At the June 2025 disposition hearing, father's counsel's argued that father had openly held himself out as F.'s father once he received the results of the paternity test and thereafter received F. into his home. Further, a parental relationship had developed between father and daughter in the short time available to them. Father's counsel thus asked that father be deemed the presumed father. DCFS and minor's counsel agreed, urging that father had held himself out as F.'s father, received her into his home, and made efforts to enroll her in services and provide for her medically. Mother counsel objected to giving father presumed or quasi-presumed parent status, urging that father had not demonstrated a full commitment to parental responsibilities and had not been prevented from doing so.

The juvenile court adopted the arguments of minor's counsel, father's counsel, and DCFS, finding that father had demonstrated a full commitment to his parental responsibilities, including meeting F.'s special needs, once he was determined to be her biological father. Further, father had been thwarted from developing a relationship with F. because mother had not made F. available for DNA testing. The court also found that F. was bonded with father, cried when the visits were over, and looked to

12

father for support. Finally, the court rejected mother's claim that her sexual encounters with father were not voluntary. The court thus deemed father a presumed and *Kelsey S.* father.[3]

With regard to disposition, the court found that removal of F. from mother was necessary because there was clear and convincing evidence that F. would be in substantial danger in mother's care. Specifically, the court noted that as recently as June 10, mother had disclosed auditory hallucinations that directed her to harm F. The court further found that father was a previously noncustodial father who wished to have F. placed with him, and placement of F. with father would not be detrimental to her physical or emotional well-being. Alternatively, the court found that placing F. with father was in her best interests. The court thus released F. to father under court supervision. The court ordered mother to complete a parenting class, participate in individual counseling, take all prescribed medications, and drug test upon reasonable suspicion of drug use, and it ordered father to participate in a National Alliance of Mental Illness family program and attend to all of F.'s needs. Mother was granted twice-weekly monitored visits with F.

On July 12, the case was transferred to San Diego County, where father resided.

Mother timely appealed.

## DISCUSSION

Mother contends: (1) substantial evidence does not support the juvenile court's jurisdictional findings; (2) the juvenile court abused its discretion by removing F. from mother's custody; and (3) the juvenile court erred by placing F. with father because he

---

[3]     *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).

13

was not a presumed or quasi-presumed father and, as a mere biological father, he was not entitled to physical custody. Mother's contentions lack merit, as we discuss.

## I. Substantial evidence supports the juvenile court's jurisdictional findings.

Section 300, subdivision (b)(1)(D) provides that a child is within the juvenile court's jurisdiction if, among other things, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he inability of the parent or guardian to provide regular care for the child due to the parent's . . . mental illness."

We review the juvenile court's jurisdictional findings for substantial evidence. " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Mother contends that "[h]arm to the child cannot be presumed from the mere fact of mental illness of the parent" (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540), and DCFS failed to present evidence tying her mental illness to a substantial risk of harm to F. We do not agree. As an initial matter, there was substantial evidence that mother had severely neglected F. prior to her detention: Specifically, mother had not recognized or sought help for F.'s developmental delays or for her serious tooth decay, which required extractions, fillings, and a dental bridge.

14

There was, moreover, substantial evidence that mother's untreated schizophrenia put F. at substantial risk of serious future harm. Mother admitted hearing voices that instructed her to hurt F., and although mother had never acted on those instructions, she acknowledged having done other things against her will at the direction of the voices, including having sex with a variety of men. Further, mother's siblings and two psychiatrists expressed concern about F.'s safety in mother's care. The first psychiatrist opined that F. was not safe in mother's care because of mother's active delusions, and the second opined that mother's "severe untreated psychotic symptoms interfere with her ability to parent her young child." The juvenile court was entitled to rely on the opinions of these experts in finding that F. had suffered, and was likely to continue to suffer, serious harm in mother's care as a result of mother's untreated mental illness.

The present case is distinguishable from *In re James R.* (2009) 176 Cal.App.4th 129 (*James R.*), overruled on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628, 624, on which mother relies. In *James R.*, the juvenile court sustained a petition alleging that three young siblings were at risk of harm after their mother, who had a history of suicide attempts, was hospitalized for consuming alcohol and taking prescription ibuprofen. (*Id.* at pp. 131–132.) The Court of Appeal reversed, noting that although the mother had a history of mental instability, she did not have a diagnosed psychiatric illness, had never abused or neglected the children, and lived with the children's father, who was protective. Further, the parents had support from extended family who assisted with childcare. (*Id.* at pp. 132–137.) On this record, the court concluded that "[t]here was no evidence of a specific, defined risk of harm to the minors

15

resulting from [the mother's] mental illness or substance abuse, and no evidence [the father] did not or could not protect them." (*Id.* at p. 137.)

Here, in contrast to *James R.*, mother had been diagnosed with schizophrenia, which rendered her unable to distinguish hallucinations from reality. Her hallucinations actively interfered with her ability to parent F.: She insisted F. was not on the autism spectrum, did not allow F. to socialize with other children, was fearful of allowing F. to receive medical care, and heard voices that she believed were instructing her to harm F. Moreover, mother did not live with another adult who could protect F., and she did not have support from her extended family. Finally, mother did not accept her diagnosis and was reluctant to take medication to control her psychosis. Unlike in *James R.*, therefore, mother's mental illness in this case created a "specific, defined risk of harm" to F. (*James R.*, *supra*, 176 Cal.App.4th at p. 137.)

## II. Substantial evidence supported the juvenile court's removal finding.

Section 361, subdivision (c)(1) provides that a child shall not be taken from the parents' physical custody unless the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." The court "shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home" and "shall state the

16

facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

We review a dispositional order removing a child from a parent for substantial evidence, " ' "keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." ' (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)" (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.) In applying this standard of review, " 'the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' [Citation.] We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Ibid.*)

Mother contends the juvenile court abused its discretion by removing F. from her care because she was cooperating with service providers, including DCFS, an in-home counselor, the Salvation Army case manager, and the medication management team. We do not agree. In October 2023, mother refused to participate in Project Safe, an early intervention child abuse prevention program, or to drug test unless required to do so by a court. Mother was reluctant to get medical care for F. because she believed the health center wanted to sexually traffic F., and she had not sought treatment for her schizophrenia because she did not think schizophrenia was a " 'real illness.' " Further, mother heard voices she believed were instructing her to harm F., both before *and* after she began taking antipsychotic medication. And, two psychiatrists opined that mother should not be alone

17

with F. until she was stabilized on medication. On this record, the juvenile court was well within its discretion in finding by clear and convincing evidence that F. was in substantial danger in mother's care and could not be protected without removal.

## III. The juvenile court did not err by deeming father a *Kelsey F.* father and placing F. in his care.

Mother contends that the trial court erred by placing F. with father because (1) he was not a presumed or quasi-presumed father, and therefore he was not entitled to custody under section 361.2, and (2) it was not in F.'s best interests to be placed with father. These contentions lack merit, as we discuss.

### A. The juvenile court did not err by deeming father a quasi-presumed parent entitled to custody under section 361.2.

Section 361.2, subdivision (a) provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

A presumed or quasi-presumed father—but not a biological or alleged father—is a "parent" within the meaning of section 361.2. (*In re E.T.* (2013) 217 Cal.App.4th 426, 437; *In re Zacharia D.* (1993) 6 Cal.4th 435, 451.) A presumed father is one who, among other things, "receives the child into his home and

18

holds himself out as the child's father." (*In re Jayden G.* (2023) 88 Cal.App.5th 301, 309; *In re Jerry P.* (2002) 95 Cal.App.4th 793, 801–802.)  A quasi-presumed or *Kelsey S.* father (see *Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 442) is one who has been thwarted by the mother or a third party from obtaining presumed parent status, but " 'promptly comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise.' " (*M.M. v. D.V.* (2021) 66 Cal.App.5th 733, 743.)  A biological father "is one whose paternity of the child has been established but who has not qualified as the child's presumed father." (*In re Jayden G.*, at p. 309.)  And, an alleged father is a man who may be the father of the child but who has not established biological paternity or presumed father status.  (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.)

A man who claims presumed or quasi-presumed father status has the burden of establishing by a preponderance of the evidence the facts supporting his claims.  *(In re E.T., supra, 217 Cal.App.4th at p. 437; In re T.R., supra, 132 Cal.App.4th at p. 1210.)*  On appeal, we review the juvenile court's finding for substantial evidence.  (*County of Orange v. Cole* (2017) 14 Cal.App.5th 504, 509.)

Mother contends that the juvenile court erred by deeming father a quasi-presumed father entitled to custody under section 361.2 because he did not support mother and F. as soon as he learned mother was pregnant.  We do not agree. Although quasi-presumed father status requires a father to "promptly come[ ] forward and demonstrate[ ] a full commitment to his parental responsibilities" (*Kelsey S., supra*, 1 Cal.4th at p. 849), courts have held that in some cases in which the identity

19

of a child's father is in question, a man may be a quasi-presumed father if he promptly assumes parental responsibilities as soon as his biological paternity is confirmed. In *In re Julia U.* (1998) 64 Cal.App.4th 532 (*Julia U.*), for example, a biological father did not assert his parentage as soon as he learned of the mother's pregnancy, but he did so as soon as it was confirmed through DNA testing that he was the child's father. Under these circumstances, the Court of Appeal held that the juvenile court erred by terminating parental rights without allowing the biological father the opportunity to seek presumed father status and an opportunity to reunify. (*Id.* at p. 544.) The court explained: "The record indicates [the biological father] had no more than a casual relationship with [the mother] and they had sexual intercourse only twice. Before becoming pregnant with Julia, [the mother] was engaging in multiple acts of sexual intercourse with varying persons. She named three males as Julia's alleged father. Based on [the mother's] promiscuity and [the biological father's] casual relationship with her, the evidence is weak that he had reason to expect his sexual activity with [the mother] would result in her pregnancy. According to [the biological father], he did know [the mother] was pregnant, but believed the father was [another man]." (*Id.* at p. 541.) Further, from the biological father's initial contact with child protective services, he expressed his desire to establish a relationship with the child if the paternity test showed he was her biological father. (*Id.* at pp. 541–542.) Under these circumstances, the juvenile court erred by refusing to allow the biological father to prove his presumed father status. (*Id.* at p. 544.)

The present case is analogous to *Julia U.* As in that case, father's uncertainty that F. was his child was reasonable: Father

spent just two days with mother, and mother told father that F. "might be this other guy[']s" when she told him she was pregnant. Father immediately asked mother to have a paternity test and said he would "be a part of [F.'s] life" if testing revealed he was the father.  Further, as in *Julia U.*, father appeared in court as soon as he learned F. had been detained and asked the juvenile court to order a paternity test.  Additionally, father requested visitation with F. pending receipt of the results of the test and, as soon as he was permitted to do so, he submitted to an assessment of his home, traveled to Los Angeles from San Diego for monitored visits with F., had an unmonitored overnight visit with her in his home, and requested custody of F.  He then agreed to add F. to his medical insurance and accepted full custody of her. The juvenile court thus was within its discretion to deem father a quasi-presumed father.[4]

The present case is distinguishable from *In re D.S.* (2014) 230 Cal.App.4th 1238, on which mother relies.  There, the mother and biological father met when mother was 19 years old and the biological father was 45 years old.  The mother had just been released from jail and needed a place to stay, so she moved in with the biological father and began prostituting herself at his request.  The biological father subsequently was arrested and remained incarcerated throughout the mother's pregnancy and the child's birth.  (*Id.* at pp. 1240–1241.)  During that time, mother moved in with a another man, whom she married and who was present at the child's birth.  (*Ibid.*)  After the biological father's release from prison, he attempted (unsuccessfully) to file

––––––––––––––––––––

[4]     Having so concluded, we need not consider whether father is also a statutory presumed father under Family Code section 7611.

a parentage action, but he had limited contact with the child and contributed only $120 towards the child's support. (*Id.* at p. 1241.) Approximately 18 months later, a juvenile dependency petition was filed, and the biological father and the child's stepfather both sought presumed father status. (*Id.* at p. 1243.) The Court of Appeal found that as a matter of law, the biological father was not a presumed father because he had not " 'done all that . . . he could have done' " to support the child: He provided the child with only minimal financial support, threatened one of the child's caregivers, and did not vigorously assert his legal rights until the dependency action was filed. (*Ibid.*) These circumstances "preclude[d] a finding that [the biological father] [was] a presumed father . . . under *Kelsey S.*" (*Id.* at p. 1246.)

The present case is distinguishable in significant ways from *In re D.S.* There, although the biological father's paternity was never in doubt, he did not take meaningful steps to support the child or to receive the child into his home. In the present case, in contrast, father reasonably questioned whether he was F.'s father, and once a DNA test established his paternity, he immediately sought visitation and custody of F. Moreover, no other man came forward in the present case to seek presumed father status or to seek a role in F.'s life. *In re D.S.*, thus, does not preclude a finding that father is F.'s presumed father.

### B. Alternatively, the juvenile court did not err by concluding that placement with father was in F.'s best interests.

In any event, even if father were not F.'s presumed or quasi-presumed father, the juvenile court still had discretion to place F. with him. Although a biological father who is not a presumed or quasi-presumed father is not *entitled* to custody

22

under section 361.2 (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1494), a juvenile court nonetheless has broad discretion pursuant to section 362, subdivision (a), to issue "any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child" (§ 362, subd. (a)). Under section 362, subdivision (a), therefore, the juvenile court may order a child placed with a biological parent if doing so is in the child's best interests. (See *In re R.Q.* (2023) 96 Cal.App.5th 462, 468–470 [juvenile court did not abuse its discretion by placing child with " 'mere' " biological father; juvenile court had discretion to determine placement was in child's best interests because biological father expressed interest in the child as soon as the dependency proceedings began, appeared at most of the hearings, participating in visits with child, and was attentive and loving with child during visits].)

Mother contends that placing F. with father was not in F.'s best interests because F. has some special needs, father was not involved with F. during the first three years of her life, the court had very little information about father's relationship with his other biological children, and father's home is a distance from mother's, making it difficult for mother to reunify with F. While these concerns are appropriately considered as part of a best-interests analysis, that analysis is within the province of the juvenile court, *not* the Court of Appeal, and the juvenile court's conclusion may not be reversed absent an abuse of discretion. (*In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1273; *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) Under the abuse of discretion standard, "[w]e do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the

juvenile court.  [Citation.]  We ask only whether the juvenile court abused its discretion with respect to the order it made." (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1195.)

We find no abuse of discretion here.  The record before the juvenile court reflects that father expressed interest in assuming custody of F. as soon as he learned of DCFS's involvement, and he was loving and attentive to her during visits.  F. was reported to be comfortable with father during visits, calling him " 'Daddy,' " seeking his attention, sitting on his lap, and crying when visits were over.  Father's home was appropriate and safe for F., and father was proactive in obtaining supplies for F. and seeking out services to meet her special needs.  On this record, therefore, the juvenile court did not abuse its discretion in concluding that placing F. with father was in her best interests.

24

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P.J.

We concur:

EGERTON, J.

ADAMS, J.